764 So.2d 223 (2000)
Helen Davis BARKSDALE, et al., Plaintiffs-appellants.
v.
LINCOLN BUILDERS, INC., et al., Defendants-appellees.
No. 32,857-CA.
Court of Appeal of Louisiana, Second Circuit.
June 21, 2000.
Rehearing Denied August 17, 2000.
*224 Cook, Yancey, King & Galloway by Bernard S. Johnson, Shreveport, Counsel for Appellants.
*225 Theus, Grisham, Davis & Leigh by J. Michael Hart, Monroe, Storms & Storms by Tyler G. Storms, Ruston, Counsel for Appellees.
Before CARAWAY, PEATROSS and SAMS (Pro Tempore), JJ.
CARAWAY, J.
In this dispute between limited partners and general partners concerning the management of a failed partnership in commendam, the trial court dismissed portions of the claims of the limited partners by granting a partial exception of prescription and a partial summary judgment. Finding that the trial court misconstrued the scope of the fiduciary duty owed by the general partners to the limited partners in considering plaintiffs' claims, we reverse the rulings and remand for further proceedings.

Facts and Procedural History
The plaintiffs, Helen Barksdale and her daughters (collectively, the "Plaintiffs") dispute the actions of their general partners in the management of a partnership in commendam which owned a shopping center in Ruston, Louisiana. Plaintiffs were limited partners in the venture and their claims, detailed below, generally involve allegations of the breach of the fiduciary duty of the general partners. An overview of the lengthy and complicated partnership agreement and its amendments is essential for the resolution of this appeal of two judgments by the trial court which dismissed portions of the Plaintiffs' claims.
In 1979, Plaintiffs owned real estate at the intersection of 1-20 and U.S. Highway 167 in Ruston. Plaintiffs entered into the limited partnership agreement contributing the land, valued at $800,000 by the parties, for a 22% interest in the partnership and being designated as "Class A" limited partners. Other investors contributed cash and promissory notes totaling $1,197,000 for a 28% interest in the partnership and were designated "Class B" limited partners. Hollis Graham ("Hollis") and his company,[1] Lincoln Builders, Inc., were the general partners and supplied expertise for the construction and management of the shopping center for a 50% interest in the partnership. Lincoln Builders, Inc. and the heirs of Hollis (hereinafter "Defendants") are the named defendants.
The private placement memorandum for the venture envisioned interim financing followed by a permanent loan projected to be amortized over a 28-year period. The Articles of Partnership in Commendam (the "Partnership Agreement") dated October 5, 1979 provided that Plaintiffs would be paid $10,000 per quarter from the inception of the partnership until construction of the shopping center began, $15,000 per quarter during construction, and $20,000 per quarter after the funding of a permanent loan on the project. According to the Partnership Agreement, these quarterly "capital distributions" to the Plaintiffs would be paid from loan proceeds until the funding of a permanent loan on the shopping center and thereafter out of revenue and profits generated from the partnership. In addition to the quarterly distributions to Plaintiffs, the Partnership Agreement provided for the payment of $800,000 to Plaintiffs upon liquidation subject to the rights of creditors and the payment of certain other priority distributions. The Partnership Agreement provided for a 35-year term.
The shopping center was completed in 1989 after two phases of construction. After the initial construction, a $5,500,000 loan was obtained in 1986. The loan required only the payment of monthly interest on the debt with the unpaid principal balance becoming due at the end of a ten-year term. In 1988, a second loan for $2,000,000 was obtained by the partnership. *226 This loan also required only the monthly payment of interest with a ten-year term.
The partnership's primary source of income was from its rentals from the shopping center businesses. Based upon the income and expense information for the fiscal year ending September 30, 1990 as detailed in an appraisal of the partnership's value prepared for Hollis's succession, the partnership had a net operating income of $760,654. This was based in part upon total rental receipts of $1,088,002 and total management and leasing fees of $119,680. The $7,700,000 value of the partnership as listed in the appraisal at that time was approximately equal to the amount of indebtedness of the partnership.
The Partnership Agreement provided for the annual distribution by the general partners of "positive cash flow" to the partners in accordance with a priority schedule for payments. From the positive cash flow, the agreement contemplated that the general partners would receive management and leasing fees payable to Lincoln Management, Inc., a management entity owned and controlled by the Graham family. However, since Hollis never incorporated such entity prior to his death in 1990, he or his family and Lincoln Builders, Inc. were directly paid those fees until 1992.
The key provisions discussing the distribution rights to the partners and defining "positive cash flow" are contained in Section 8.03 of the Partnership Agreement and provide as follows:
8.03 (a) After the funding of the permanent loan on the shopping center development, the General Partners may distribute annually so much of the positive cash flow (as defined) of the Partnership as they determine, in their sole discretion, is not required for the prudent and businesslike conduct of the affairs of the Partnership and for payments of the debts of the Partnership, taking into consideration the future needs of the Partnership, except as otherwise herein set forth.
* * *
(c) "Positive Cash Flow" is defined as the annual net profits or losses derived from the operations of the Partnership as ascertained through the use of generally accepted accounting practices on the accrual method of accounting, consistently applied, except that:
(i) the following items shall be considered an addition to profits and correspondingly a deduction from losses:
(a) Depreciation of property of the Partnership.
(b) Amortization of organization costs and amortization of loan acquisition costs.
(c) Tax deductible expenses funded or paid from the capital contributions of the Class B Partners in Commendam.
(d) Accrued interest on debts of the Partnership.
(e) Accounts payable to the Partnership.
The following items shall be considered as a subtraction from profits and correspondingly an addition to losses:
(a) Prepaid interest on debts of the Partnership.
(b) All principal payments made on debts of the Partnership from operating revenues of the Partnership (except for principal paid on the Lincoln Builders of Ruston, Inc. loan, which shall not be considered a subtraction from profits and an addition to losses).
The priority schedule under Section 8.03 for annual payments of "positive cash flow" to partners[2] can be summarized in the order of priority as follows:

*227 (i) A 4% management fee to Lincoln Management, Inc. (on behalf of the general partners);
(ii) An $80,000 ($20,000 per quarter) "first priority distribution right" to the Class A Partners (the Plaintiffs);
(iii) Leasing fees to Lincoln Management, Inc. up to 2% of the gross rents of the shopping center;
(iv) An additional 2% management fee for Lincoln Management, Inc.;
(v) A "second priority distribution right" to the Class B Partners for a 10% return on their net capital contributions or investment of cash into the partnership;
(vi) After the satisfaction of all of the above, additional positive cash flow was to be allocated among all partners in proportion to their ownership of the partnership.
In July 1987, a tenant in the shopping center, a cafeteria, decided to close. Hollis determined that the partnership would take over the operation of the cafeteria. When Hollis died in 1990, his widow and children continued management of the shopping center including the cafeteria. For some periods, Hollis and later, his widow and children, paid themselves a salary or commission as manager of the cafeteria. Over time, the cafeteria experienced sizable losses which were charged to the Partnership.
In early 1992, the general partners proposed and all partners, including Plaintiffs, executed a third amendment (hereinafter the "Third Amendment") to the Partnership Agreement which ratified the management and leasing fees which were supposed to have been paid to Lincoln Management, Inc. but which had in fact been paid directly to Hollis or his successors. Additional payments of leasing fees by the general partners to Jack Smith for his services were ratified. The general partners had by this time acquired all the Class B limited partnership interest from the original Class B partners. This Third Amendment stated in its preamble that distribution of "positive cash flow" had not been made in prior years to the Class B partners and that those distributions "now should be made." Subsequently, between 1992-1996, $740,000 was paid to Defendants as Class B partners. Finally, the Third Amendment provided for the substitution of the Succession of Hollis Graham as a general partner of the partnership in place of Hollis.
In 1996, the partnership was unable to come up with the funds required to induce the lender to extend or renew the loans which the partnership had outstanding and the lender declared a default and initiated foreclosure proceedings. The foreclosure was completed in January 1997.

Plaintiffs' Petition
On June 30, 1997, Plaintiffs filed a "Petition for Accounting and for Damages" instituting this action. While claiming that the Defendants, as general partners, owed an accounting for the losses experienced by the partnership, the Plaintiffs also alleged that the general partners had breached their fiduciary duties to the Plaintiffs. Those allegations, most of which became the focus of the trial court's partial judgments of dismissal, are set forth in the following paragraphs of the petition:
5.
The defendant general partners arranged permanent financing for $5,500,000 in 1986. The general partners did not increase the quarterly distributions to the Class A partners from $15,000 to $20,000, as called for under the partnership agreement, until the third quarter of 1989. The losses suffered by plaintiffs as a result of this delay in increasing the contractually mandated payments total $50,000 in principal and $44,587.50 in interest, calculating interest at the legal rate from the due date of each underpayment.

*228 6.
The financing arranged by the defendant general partners did not provide for any reduction of the principal amount of the debt, nor was any such reduction made during the life of the loan. Had the loan been an amortizing one, the "Positive Cash Flow" (as defined in the partnership agreement) would have been decreased by those principal payments, and (i) the likelihood that the general partner would earn management and leasing fees would have been diminished and (ii) the likelihood that plaintiffs would have received the distribution of $800,000 upon sale of the property called for under the partnership agreement would have been increased.
* * *
8.
The defendants caused the partnership to pay a duplicate leasing commission of 4% to Jack Smith, in addition to the leasing commission paid to Lincoln Management, Inc. Upon information and belief, plaintiffs allege that one-half of this leasing commission was rebated to Hollis Graham, to his succession, or to Lincoln Management, Inc. by Mr. Smith, without the knowledge or consent of plaintiffs.
9.
Beginning in 1987, the general partners caused the partnership to begin operating a cafeteria as a tenant of the shopping center, and the partnership sustained substantial losses (totaling $734,649) through 1995. The general partners' actions, in operating the cafeteria on behalf of the partnership, were beyond their authority and plunged the partnership into a business operation never envisioned or authorized by the limited partners or the partnership agreement. Moreover, the general partners of their affiliates collected management fees attributable to the rent paid by the cafeteria to the partnership, as well as leasing commissions (even though there was no lease). In addition, they paid themselves a management fee inside the cafeteria operation itself (that is, as an expense to the cafeteria operation, not of the partnership). They also received the benefit of a number of free or discounted meals for their families.
* * *
11.
In 1995, the general partner ceased paying the $20,000 per quarter distributions to the Class A partners, although it continued to pay the management and leasing fees to its affiliate, Lincoln Management, Inc.
12.
When the loan matured in 1996, the general partners failed to arrange alternative financing, and the property was sold at sheriff's sale in January 1997. The sale triggered serious adverse income tax consequences for the partners.
The petition further states that Defendants should restore to the partnership all amounts paid to themselves, including "fees paid by the partnership or on its behalf to the general partners or to their insiders or affiliates as management or leasing fees or otherwise, all transactions regarding the operations of the cafeteria, all amounts paid to the Class B limited partners, and all amounts paid to any other party as leasing commissions." The petition prays for an award of "such damages as the Court may find are owed under the circumstances."

Answer and Reconventional Demand
In their "Answer and Reconventional Demand," Defendants set forth the affirmative defense that Plaintiffs had ratified the payment of all management and leasing fees to the general partners or to Jack Smith by the 1992 Third Amendment. Additionally, in their reconventional demand *229 against Plaintiffs, Defendants sought reimbursement of all priority distributions made to Plaintiffs as Class A partners totaling $985,000. The grounds for this reimbursement were asserted in the reconventional demand as follows:
29.
The partnership was at all times "insolvent" or "not solvent" according to the legal definitions found within the Louisiana Civil Code.
30.
Limited partners cannot be paid distributions from an insolvent limited partnership.
31.
Distributions from insolvent limited partnerships which were received by limited partners should be revoked by the general partners after the mistake is discovered.
32.
Accordingly, the Barksdales should restore approximately Nine Hundred Eight-Five Thousand And No/100 ($985,000.00) Dollars which were paid to them contrary to law. Legal interest is also owed.

Partial Judgments Rendered by the Trial Court
Defendants filed a peremptory exception of prescription on August 25, 1997 attacking, as prescribed, (1) Plaintiffs' claim for damages for failure to increase quarterly payments to $20,000 in 1986, (2) Plaintiffs' claim that the permanent financing arranged by the general partners did not provide for any reduction in the principal amount of the debt, and (3) Plaintiffs' claims regarding the partnership's operation of the cafeteria. The trial court found that because of annual financial data provided to Plaintiffs, they knew or should have known that permanent financing had been obtained in 1986 and that their quarterly payments should have increased. Because Plaintiffs failed to bring their claim for increased payments within the ten year prescriptive period, it had prescribed. Addressing the general partners' alleged failure to secure an amortizing loan for the partnership the court ruled:
In this case we have a claim for damages based on a breach of fiduciary duty claim allegedly due to the failure by defendants to obtain permanent financing and/or an amortizing loan. This loan was arranged in 1986 (one act), and no other acts have alleged to have occurred since then.
Accordingly, the trial court ruled that plaintiffs' claims alleged in Paragraph 6 of the petition had prescribed. As for the claim concerning the leasing fees and the operation of the cafeteria, the trial court held that any claims arising in tort were prescribed but any claims arising in contract had not prescribed.
Defendants also filed a motion for summary judgment regarding the payment of management or leasing fees to the general partners prior to January 1, 1992. By virtue of the Third Amendment, Defendants claimed that Plaintiffs ratified those fees and thus waived any claims arising out of the ratified general partners' actions. The trial court found that the contractual provisions in the amendment were unambiguous and constituted an approval of both the payee and the amount of management and leasing fees which had been paid. The trial court therefore granted Defendants' motion for partial summary judgment dismissing Plaintiffs' claims with prejudice regarding the management and leasing fees paid to the general partners prior to January 1, 1992.

Discussion
Plaintiffs initially contest the propriety of the trial court's sustaining of the exception of prescription in part. Additionally, we note that the trial court's other ruling granted a partial summary judgment. Both partial judgments were certified *230 for appeal pursuant to La. C.C.P. art. 1915(B)(1) without either party requesting that the judgments be designated as final. In fact, in rendering its written reasons for the partial summary judgment, the trial court immediately added reasons for certification and designated the ruling as final.
The procedure employed by the trial court sua sponte in certifying or designating its partial rulings as final judgments is not favored. A request for certification should be moved for by either or both parties because in the absence of certification, such partial judgment "may be revised at any time prior to rendition of the judgment adjudicating all the claims and the rights and liabilities of all the parties." La. C.C.P. art. 1915(B)(2). As opposed to a trial court's unilateral decision on certification, the party aggrieved by the judgment should have the opportunity to voice opposition to certification. As the case may develop, Article 1915(B)(2)'s provision for revision allows a party aggrieved by a partial judgment to demonstrate to the trial court the significant relationship between the unadjudicated claims and the adjudicated partial claims and to seek reconsideration of the trial court's partial ruling. See, Brantley v. State Farm Insurance Co., 33,386 (La. App.2d Cir.5/10/00), 760 So.2d 603, and Berman v. DeChazal, 98-81 (La.App. 5th Cir.5/27/98), 717 So.2d 658.
Nevertheless, instead of dismissal of this appeal on jurisdictional grounds pertaining to these partial judgments, we choose to exercise our broad supervisory powers and review the trial court's grant of the partial exception and partial summary judgment. Gilbert v. B.D.O.W.S., Inc., 30,439 (La. App.2d Cir.4/8/98), 711 So.2d 765, writ denied, 98-1269 (La.6/26/98), 719 So.2d 1059. The trial court's rulings dismissing large portions of the Plaintiffs' claims significantly misconstrue the scope of the fiduciary duty owed by the general partners to Plaintiffs in view of the Partnership Agreement and the allegations of Plaintiffs. Therefore, we choose to address the merits, reverse the rulings, and remand for further proceedings.

Breach of Fiduciary Duty
The Louisiana Civil Code states that a partner owes a fiduciary duty to the partnership and to his partners and a partner may not conduct any activity for himself that is contrary to his fiduciary duty and is prejudicial to the partnership. La. C.C. art. 2809. This fundamental rule that the relationship of partners is fiduciary and imposes on them the obligation of the utmost good faith, fairness, loyalty and integrity in their dealings with one another with respect to partnership affairs is universally recognized in modern cases. This court has said, "Each partner must refrain from taking any advantage of another partner by the slightest misrepresentation or concealment of material facts." W.A. McMichael Const. Co. v. D & W Properties, Inc., 356 So.2d 1115, 1122 (La.App. 2d Cir.1978), writ denied, 359 So.2d 198 (La. 1978). This concept has been embodied in Louisiana jurisprudence for many years as demonstrated by a court's early analysis of the basic relationship between partners. "[A] partner has not a right to prefer his own interest to that of the firm, nor deprive the partnership of a profitable bargain by taking to his own account." Lowry v. Cobb, 9 La.Ann. 592 (1854). This rule is especially true when considering a general partner's duty to its limited partners since the general partner has complete authority to deal with the partnership business. "It has been said that the general partner, acting in complete control, stands in the same fiduciary capacity to the limited partners as a trustee stands to the beneficiaries of a trust ..." 59A Am.Jur.2d, Partnership § 1333, p. 909.
When the question is one of the general partner's fiduciary duty, concepts of reasonableness and good faith have no application. See 59A Am.Jur.2d, Partnership § 1335, p. 910. The standard of a fiduciary's duty to his beneficiary, depending on the facts of the case, lies somewhere *231 between simple negligence and willful misconduct or fraud with the intent to deceive; the actual intent to deceive is not required where one party is placed in such an advantageous position to the other. Mansfield Hardwood Lumber Co. v. Johnson, 263 F.2d 748, on rehearing 268 F.2d 317 (5th Cir.1959), cert. denied, 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 120 (1959), rehearing denied 361 U.S. 926, 80 S.Ct. 290, 4 L.Ed.2d 241.
Actions which are based on breaches of fiduciary duties constitute personal actions which are subject to a liberative prescriptive period of ten years. La. C.C. art. 3499; Kyson v. Kyson, 596 So.2d 1308 (La.App. 2d Cir.1991), cert. denied, 599 So.2d 314 (La.1992). Prescriptive statutes are strictly construed against prescription and in favor of the claim. Bustamento v. Tucker, 607 So.2d 532 (La. 1992).
In paragraph 6 of the petition, the Plaintiffs attempt to tie the general partners' choice for the financing arrangement for the partnership debt to their ability to pay themselves management and leasing fees. From a review of Section 8.03 of the Partnership Agreement and the detailed definition listed for the computation of "positive cash flow," there does appear to be a clear relationship between the payment of debt and the availability of "positive cash flow" out of which the general partners' fees could be paid. The amount of "positive cash flow," which is first comprised of the amount of the annual net profits, is reduced by "all principal payments made on debts of the Partnership from operating revenues." Additionally, Section 8.03(a) cautions that the priority payments to all partners, including the general partners' fees, are to be made only out of that portion of the positive cash flow "not required for the prudent and businesslike conduct of the affairs of the Partnership and for payments of the debts of the Partnership." (Emphasis added).
The two promissory notes for the $7,500,000 debt of the partnership are in the record, and while both require monthly payment of interest only, each contains provisions allowing for the prepayment of the principal on the loan. In any event, regardless of the general partners' choice of non-amortized loans which were made in 1986 and 1988, the financial viability of the partnership was obviously tied to the long term management and reduction of its sizable debt. The interest on the debt, the expected future revenues and profits of the partnership, and the prospects for reduction, renewal, or foreclosure of the debt were items for management consideration falling exclusively within the responsibility and expertise of the general partners. In this case, the Defendants have admitted the insolvency of the partnership throughout the ten-year period preceding this suit. The debt could not be renewed in 1996 and the business failed. These are all significant factors indicating mismanagement of the partnership debt. Coupled with this claim of mismanagement from the failure to reduce the debt through amortized loan payments or otherwise, Plaintiffs allege that the general partners paid themselves fees which should have gone to reduce the debt in accordance with Section 8.03. This tension or conflict of interest is the basis for the breach of the general partners' fiduciary duty as that duty is defined in the jurisprudence.
Despite the provisions of Section 8.03, the Plaintiffs' claims in paragraph 6 of the petition and the Defendants' admission of insolvency, the trial court ruled that "one act," the 1986 financing of the first loan, was the basis for the alleged breach of fiduciary duty and that the applicable ten-year prescriptive period in which to dispute that act had run. This focus on one act of alleged mismanagement is misplaced.[3] The issue of fiduciary breach centers *232 instead on the general partners' recurring decisions to pay themselves fees periodically over many years. The alleged impropriety of those fees and the other alleged payments to the general partners of fees from the cafeteria and Jack Smith raise the element of self-dealing by the general partners throughout the ten years preceding this action, implicating their actions as fiduciaries.
Accordingly, the trial court's ruling that prescription has run on Plaintiffs' claim for the breach of defendants' fiduciary duties as set forth in paragraph 6 of the petition is hereby reversed.
In a related and somewhat overlapping ruling, the trial court granted partial summary judgment dismissing all claims regarding the management and leasing fees paid to the general partners prior to January 1, 1992 because of Plaintiffs' ratification of those fees in the Third Amendment. Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B).
Paragraph III of the Third Amendment provided as follows:
The Partners hereby ratify and approve all payments of management fees, leasing fees and all other fees paid heretofore by the Partnership to either or both General Partners, to the extent such fees would have been paid to Lincoln Management, Inc. but for the fact that Lincoln Management, Inc. had not been formed at the time of payment. The Partners herewith further recognize that commencing as of the 26th day of March, 1992 all such fees shall thereafter be paid to Lincoln Management, Inc. in accordance with the provisions of the Articles of the Partnership and all amendments thereto.
Plaintiffs insist that their ratification of the management and leasing fees only conveyed their intent to excuse the prior payments of the fees to Hollis instead of to Lincoln Management, Inc., as originally called for in Section 8.03 of the Partnership Agreement. They cite a 1992 letter by Ronald Graham, Hollis's son, proposing the Third Amendment "to recognize the payments to my father which should have been made to Lincoln Management, Inc." On the other hand, the trial court found that the language of the Third Amendment was unambiguous and ratified both "the payee and the amount of the fees." Because of the ratification, the court found "no legal basis for [Plaintiffs] to now assert that the payment of said fees was improper."
The basis of the Plaintiffs' claims for the breach of a fiduciary duty is that at the time that the general partners were paying themselves fees there was not enough positive cash flow "for the prudent and businesslike conduct of the affairs of the Partnership and for payments of the debts of the Partnership." (Section 8.03) If those assertions are proven, the general partners as the managing agents of the Partnership knew, or at least should have known, that the payment of fees to themselves was in violation of Section 8.03 of the partnership and served their benefit to the detriment of the partnership by increasing its insolvency.
As indicated above, the managerial considerations for making the decision regarding the reduction of debt for the protection of the partnership are complex and were exclusively within the responsibility of the *233 general partners to weigh. They were in a superior position to the Plaintiffs to make that decision at the time of the execution of the Third Amendment and in the preceding years. The evidence presented concerning this motion for summary judgment shows that no principal payments on the debts were made prior to the time of the Third Amendment and that considerable fees were paid to the general partners. Although those facts were known to the Plaintiffs in 1992, the general partners were in the superior position to understand those facts, to assess the solvency of the partnership, and to know whether their prior payment of fees to themselves had increased the likelihood of a foreclosure of the business.
This disputed Third Amendment is a contract between the fiduciaries/general partners and the limited partners by which the fiduciaries are effectively now claiming that the limited partners contractually consented to any pre-1992 breach of the fiduciaries' duties owed to the limited partners. By raising the Third Amendment as an affirmative defense, Defendants necessarily concede that although fiduciary duties may have been breached by them prior to 1992 by the payment of their fees to the detriment of the partnership, Plaintiffs gave their consent to those prior violations of duty. Nevertheless, as expressed in the 1980 revision comment (b) discussing Civil Code article 2809's imposition of a partner's fiduciary duty: "Consent by the partners or the partnership to permit activities that otherwise would be contrary to a partner's fiduciary duty should be given effect to avoid the consequences of this article only when the consent is given after there has been a full disclosure of all relevant information." (Emphasis added). On the mere language of the Third Amendment, we find no expression of intent indicating that Plaintiffs understood in 1992 that the prior payment of fees to the general partners had jeopardized the financial well-being of the partnership, that they nevertheless approved the payment of those fees, and thus released the general partners of any prior breach of their fiduciary duties.
This situation is similar to the partners' compromise and release addressed in W.A. McMichael Const. Co., supra. There, a former partner, McMichael, sought to set aside an agreement by which it withdrew from the partnership and released and compromised all existing controversies "disclosed or undisclosed" between the partners. As a result, the managing partner acquired all interests of McMichael in a valuable property lease owned by the partnership at the time of McMichael's execution of the withdrawal and compromise. Although the managing partner had knowledge of recent developments which greatly enhanced the value of the partnership's lease, McMichael did not. The court found that the managing partner had breached its fiduciary duty to McMichael by not disclosing this financial information at the time of McMichael's withdrawal and compromise. Nevertheless, despite the breach of the fiduciary duty, the managing partner argued that the compromise agreement executed by McMichael released all "undisclosed" claims between the partners, including the debt owed because of the fiduciary's breach of duty.
This court, in reviewing the unambiguous language of the compromise, nevertheless recognized that McMichael's consent to the compromise was itself tainted by the same failure of the fiduciary to disclose the material and pertinent financial data. In setting aside the compromise for this vice of consent, the court stated:
In the case of error, where the information which would have destroyed the error has been withheld by the other party to the contract, it comes under the heading of fraud, and invalidates the contract. LSA-C.C. Art. 1832.
Numerous cases hold that an intention to deceive and resulting loss or damage are essential elements of fraud. Fraud must be proved by him who alleges it, but it may be proved by simple presumptions *234 or by legal presumptions, as well as by other evidence. The maxim that fraud is not to be presumed means no more than it is not to be imputed without legal evidence. LSA-C.C. Art. 1848.
Louisiana courts have had difficulty articulating, within the framework of civil law concepts, the theory upon which redress is granted for breach of fiduciary duty, particularly where the redress is the setting aside of a sale. Mansfield Hardwood Lumber Company v. Johnson, 263 F.2d 748, on rehearing 268 F.2d 317 (5th Cir.1959), certiorari denied, 361 U.S. 885, 80 S.Ct. 156, 4 L.Ed.2d 120 (1959), rehearing denied 361 U.S. 926, 80 S.Ct. 290, 4 L.Ed.2d 241. However, whether based on fraud, presumptive or constructive fraud, error, or equitable principles, Louisiana courts have consistently set aside transactions or otherwise afforded effective relief where a fiduciary secured an unfair advantage by failure to disclose material information to the principal's detriment. See the cases cited in Section I of this opinion and the cases cited in Mansfield Hardwood Lumber Company v. Johnson, supra. Although the result in some of these cases was predicated on a specific finding of fraud or an intent to deceive, the same result was reached in a number of other cases without such a specific finding. Breach of fiduciary duty was the key ingredient in all of the cases.
W.A. McMichael Const. Co., supra at 1124.
Unlike the ruling in W.A. McMichael Const. Co., this case has not been tried. Despite the express language of the Third Amendment on which the trial court relied in granting the partial summary judgment, a substantial issue of material fact exists regarding Plaintiffs' knowledge in 1992 of the prior insolvency of the partnership and the corresponding breach of fiduciary duty by the general partners which allegedly occurred by their payments to themselves of the management and leasing fees prior to 1992. Without such knowledge, Plaintiffs lacked the requisite intent to release the fiduciaries for their prior breach of duties, and the fiduciaries, who were in the superior position to understand the partnership's insolvency, may not profit by such release. Accordingly, we reverse the trial court's partial summary judgment because of the genuine issue of material fact regarding the Plaintiffs' consent to release Defendants from any pre-1992 breach of their fiduciary duties.

Other Partial Rulings of the Trial Court
The trial court's ruling on the exception of prescription also dismissed Plaintiffs' claims under paragraph 5 of the petition concerning the alleged failure of the general partners to have increased Plaintiffs' quarterly distributions from $15,000 to $20,000 from 1986 to 1989. Some of those quarterly payments fell outside the ten-year period prior to the filing of this action in 1997. Some, however, did not, and any errors regarding the payment of those quarterly distributions have clearly not prescribed. Additionally, the disputed payments of the quarterly distributions to Plaintiffs resulted from Section 8.03 of the Partnership Agreement which lies at the center of the principal and reconventional demands of this litigation. We believe, therefore, the trial court's ruling on this partial issue of prescription for part of Plaintiffs' claim was premature under the circumstances of this complex accounting dispute between the partners and should be deferred to the time of trial.
Finally, the trial court's ruling on the motion for summary judgment indicated that the Third Amendment had also ratified the payments made by the general partners to Jack Smith, thus releasing in 1992 any claim Plaintiffs have now asserted regarding those payments in paragraph 8 of the petition. From our review of the allegations of paragraph 8 of the petition, we find that a claim for a breach of fiduciary duty has been alleged regarding the payments of leasing fees to Jack Smith. Accordingly, for the reasons expressed above concerning the intent of the Third *235 Amendment, we find that genuine issues of material fact remain regarding this claim.

Conclusion
For the reasons expressed above, the trial court's partial judgments on Defendants' exception and motion for summary judgment on the issues of prescription and the effect of the parties' Third Amendment to the Partnership Agreement are hereby reversed. The case is remanded to the trial court. Costs are assessed to appellees.
REVERSED AND REMANDED.
SAMS, J. Pro Tem., concurs.
APPLICATION FOR REHEARING
Before CARAWAY, PEATROSS, KOSTELKA, DREW, and SAMS (Pro Tempore), JJ.
Rehearing denied.
SAMS, J., Pro Tem., would grant rehearing.
NOTES
[1] The record indicates that Lincoln Builders, Inc.'s stock ownership was majority owned by Hollis Graham and his family.
[2] The schedule also provided for certain payments to Lincoln Builders of Ruston, Inc. for repayment of a loan which we omit from the above summary of the priority list.
[3] Considered alone without the claim of self-interest, the alleged act of mismanagement by the general partners in selecting the nonamortized loan in 1986 would be measured by the business judgment standard set forth in Section 10.01 of the Partnership Agreement and not by the standard of strict scrutiny applicable to allegations of self-dealing of a fiduciary. Article 9.03 of the Partnership Agreement further states that the general partners shall not be liable "for any act performed by them in good faith, but shall be liable only for willful misconduct, gross negligence or intentional breach of this Partnership Agreement."