PEATROSS, J.
| ,A jury found that Defendant, Samuel F. Liprie, breached an oral agreement to form a joint venture with Plaintiff, Lee Roy Joyner, M.D., for the development and potential marketing of a device invented by Liprie to administer radiation treatment to the coronary artery. The jury awarded damages to Dr. Joyner in the amount of $4.3 million, plus attorney fees. Liprie now appeals. For the reasons stated herein, we affirm.

FACTS

Liprie is a nuclear pharmacist and inventor who works primarily with radiation therapy. He developed a cutting edge technology for administering “high doses” (4 curies and above) of radiation therapy directly into the body, thereby allowing the radiation to be directed at a specific part of the body. This breakthrough technology treated the cancer from within the body. Liprie licensed this “high dose” technology to Omnitron, a company owned by Liprie.
In 1993, Liprie then began testing the technology to deliver “low doses” (below 4 curies) of radiation directly and, specifically, to the coronary artery. The procedure was to be used following angioplasty surgery to prevent re-clogging or “restenosis” of the arteries. Liprie shared the idea for this intracoronary radiation therapy (“ICRT”) with Dr. Joyner and a radiation oncologist, Dr. Mark Harrison. The three men had discussions regarding a joint venture to move forward with the development and promotion of ICRT.[1]
|2In the latter part of 1993, Dr. Harrison was initiating unrelated medical research projects in the Bahamas with the assistance of Bahamian oncologists (“The Bahamian project”). The record reflects that there were four distinct research projects comprising the Bahamian project, each of which involved the three men in different capacities. This suit concerns only the *245 fourth venture, the ICRT or “heart project.” The record further reflects that discussions regarding the heart project began among Liprie and Drs. Joyner and Harrison around February 1994, culminating in a meeting of the three in Atlanta in May 1994. Orlando Gurdiel, a Venezuelan cardiologist, among other Latin American representatives, was also at this Atlanta meeting to discuss conducting human trials of the technology in Caracas, Venezuela. The ultimate goal of the venture was to have the abstract accepted by American College of Cardiologists (“ACC”) for publication at the annual convention in New Orleans in March 1995.
According to the testimony of Dr. Joyner, it was at this Atlanta meeting, following the discussions with the Venezuelans, that the joint venture agreement was reached between Liprie, Dr. Harrison and himself. He testified that, otherwise, he would not have gone forward with the project. Dr. Joyner testified:
Q: What was the agreement?
A: The agreement was to perform a study in Caracas, Venezuela using a radioactive wire that would be placed into the coronary artery to see if, number one, it could be done and, number two, if it would prevent restenosis of an artery after it had been dilated with a balloon.
[¡^Regarding the economics of the agreement, Dr. Joyner testified that the three agreed that he and Dr. Harrison would each pay one-half of the expenses of the joint venture and one half of a monthly salary to Liprie. For this, Drs. Joyner and Harrison received 25 percent ownership interest each in the joint venture. Liprie retained 50 percent ownership and would supply all of the materials and intellectual property rights to the low-dose ICRT applications for the exclusive use of the joint venture. Dr. Joyner described his contribution to the venture as follows:
Q: What was Lee Roy Joyner required to bring to the deal to be entitled to a percentage of the profits?
A: The ability to do a clinical study with a resume documenting this has been done many times in the past by Lee Roy Joyner and that this would subsequently then be published not in just peer review literature, but in prestigious peer review literature as directed specifically to the publication of what you’re doing. And further that this new treatment or this new project turns out at least for a period of time changing the way that this disease is treated worldwide....
[[Image here]]
I had to pay half of Sam Liprie’s salary at the same level of the salary that he was making of (sic) the time with Omnitron. A hundred and fifty thousand dollars a year. And I had to pay half of the expenses related to the completion of the study down to and including the ... acceptance of this study to be published in the cardiology literature.
At one point in his testimony, Dr. Joyner states that Liprie assured him at the meeting in Atlanta that he would not be required to provide any security. Later in his testimony, Dr. Joyner states that the first he knew of a requirement of security was by way of a letter dated July 15, 1994. There are, in fact, two versions of this July 15th letter in the record. Both letters |4bear the typed names of Lee Roy and Mark as authors. The copy relied on by Dr. Joyner (“the Joyner letter”) outlines the agreement as described above, making no mention of a $2.5 million security requirement. The Joyner letter does refer *246 ence efforts to “perfect the Bahamian security agreement,” but Dr. Joyner urges that that is not a reference to any independent security arrangement (for $2.5 million) as suggested by Liprie. Rather, Dr. Joyner’s testimony is to the effect that it was the intent of the three men that the Bahamian project would provide security for the heart project and that it was Dr. Harrison who was pursuing the Bahamian government for a contract. Once that contract came to fruition, it would secure any amount necessary for the heart project. In addition, we note that Dr. Joyner provided financial documents to Chris Verret, an attorney hired by Liprie, ostensibly to prove viability regarding the Bahamian contract, although it is entirely unclear from the testimony exactly what was the purpose of that disclosure.
The second version of the July 15th letter (“the Liprie letter”) is substantially the same as the first, with the addition of the following language:
We fully intend to honor our commitment of 2.5 million even if the project fails. If the project is successful and revenues are forthcoming, we would like to extend to you the option of taking the first 3 million off the top, satisfying our obligation, prior to any distribution to us.
It is this letter that Liprie cites as the first time there was an agreement reached by the three men. Liprie denies that any agreement was reached at the meeting in Atlanta. Interestingly, the Liprie letter bears a facsimile | ^notation that it was faxed from Liprie’s office on July 19, 1994. Dr. Joyner suggests that Liprie altered the letter to include the security language and that it is not the letter he authored and originally submitted to Liprie. Liprie denies this and argues that the parties modified the Joyner letter to reflect the full agreement, including the $2.5 million security requirement. Neither letter has handwritten signatures.
Dr. Joyner further testified that it was around July 13, 1994, that he became aware that Liprie was going to put a deadline on he and Dr. Harrison for providing security. The first deadline according to Dr. Joyner was “August 1994.” A thorough reading of Dr. Joyner’s testimony reveals that it is his position that he interpreted this requirement as perfection of the Bahamian contract by Dr. Harrison and both he and Dr. Harrison knew that was not possible by August 1994.
Despite the discrepancy in the terms contained in the letters of intent, the three men continued to move forward with the project. Drs. Joyner and Harrison were paying the expenses and Liprie’s salary and the plans were set for the trip to Caracas. Dr. Harrison and Liprie arrived in Caracas on July 21, 1994, and, due to passport issues, Dr. Joyner arrived the following day.
Dr. Joyner testified that it was within his expertise to determine how the human trials should be conducted in Caracas, including how many patients would be necessary to validate the procedure in order to obtain FDA approval. He determined that the group needed 21 patients and that the group had been approved by the Venezuelan doctors to perform the | ^procedure on 21 patients in Caracas. Once in Caracas, the doctors performed the procedure using the ICRT technology successfully on several patients, before experiencing a setback due to the thickness of the wire used in the procedure. After some disagreement and discussions with the Venezuelan doctors, the group was allowed to continue the trials on a few more patients, before returning to the United States on August 1st or 2nd. The record indicates that the Venezuelan doctors continued to perform the procedure after Li- *247 prie and Drs. Joyner and Harrison departed Venezuela.
Dr. Joyner also testified that he was instrumental in overcoming the setback experienced in Caracas. For this reason, Dr. Joyner testified, while the Venezuelans were debating whether to allow the study to proceed, Liprie reassured him that, if the trials proceeded, no security would be necessary from Dr. Joyner.
Shortly after returning from Caracas, on August 10, 1994, Dr. Joyner received a draft partnership agreement from Mr. Verret. The document contained a $1.25 million security provision. The document also contained a deadline of October 31, 1994. (There is additional testimony that this deadline was again extended to November 1994.) Dr. Joyner refused to sign the proposed partnership agreement citing, in his testimony, the addition of the security provision. Liprie, on the other hand, testified that the draft partnership agreement was simply his attempt to have a written agreement finalized before undertaking a second round of trials in Caracas.
This second trip to Caracas occurred in late August, after the draft partnership agreement was provided to Dr. Joyner. The record contains |7scant evidence surrounding this trip, but it is clear that Dr. Joyner did not go on the second trip. Liprie testified that there were modifications necessary to the wire which required that he return to Caracas to do more surgeries with the modified technology. Dr. Joyner disagreed, testifying that the wire used in the first trials in Caracas in July was sufficient to continue surgeries and that the Venezuelan doctors continued to perform surgeries daily with that wire. Dr. Joyner testified that Liprie did not have to modify the technology and return to Caracas a second time.
Despite the fact that he did not participate in the second round of trials in Caracas, Dr. Joyner submits that he assisted in authoring the abstract of the heart project in September 1994. In fact, the abstract bears the names of Drs. Joyner, Harrison and Liprie, among others. The ACC accepted the abstract for publication in New Orleans the following March (1995).
The record reflects that, during the months surrounding the November 1994 deadline, there were many conversations among the players in this venture regarding the requirement of $2.5 million and/or the security therefor. Dr. Joyner testified that “the closer the venture got to the finish line, ie., publishing a medical abstract, the higher the bar was raised by Liprie for Dr. Joyner to perform the oral agreement.” Dr. Joyner testified that he ultimately acquiesced in Liprie’s demand and approached businessman and friend David Harter, with whom he had had discussions about becoming involved in the heart project and others, about securing $1.25 million, or his share of the $2.5 million. Dr. Joyner provided | information on the project to Mr. Harter, who, in turn, sought the counsel of European heiress and long-time friend of Mr. Harter, Jacqui Biwer.[2]
Ms. Biwer and Mr. Harter testified by deposition that they were both excited about the prospect of being involved in the *248 heart project. Ms. Biwer further testified that she sought the advice of several doctors and concluded that she “absolutely” desired to provide funding for the project on behalf of Dr. Joyner. The record contains an agreement dated November 19, 1994, executed by Dr. Joyner, Mr. Harter and Ms. Biwer reflecting, inter alia, that Dr. Joyner transfer 50 percent of his ownership in the project to Mr. Harter and Ms. Biwer in exchange for the availability of $1.25 million payable to Liprie on demand. Ms. Biwer testified that she spoke with Liprie by telephone and advised him that she would be providing the security for Dr. Joyner. Specifically, Ms. Biwer testified that she had a telephone conversation with Liprie in December 1994 in which she advised him that she was providing “backing” of $1.25 million on behalf of Dr. Joyner. She related “Well, Sam Liprie knew that I had the [1.25] ready for Mr. Sam Liprie and ready for Dr. Joyner. I mean, however, you want to put that, we talked about the money. Yes, I wanted to back them, yes.” Ms. Biwer also testified that Liprie was aware that he could call for the funds at any time, stating “[Liprie] was totally aware that, yes, he could make the call up any time.” She further testified that the bank confirmed that she had the funds |3and, when asked about Liprie’s reaction to her commitment of $1.25 million, Ms. Biwer testified that he was excited and the two then planned a skiing trip to meet in person. Mr. Harter corroborated the testimony of Ms. Biwer in his deposition.
It is not disputed that Liprie did not “call” upon the money made available by Ms. Biwer and Mr. Harter. To the contrary, Liprie testified that there was no conversation in which he was told that security was being offered on behalf of Dr. Joyner.
In March 1995, Art Berner, another attorney hired by Liprie, advised Dr. Joyner by letter that Dr. Joyner would no longer own 25 percent of the joint venture and that the venture would be incorporated into a new entity, Angiorad, Inc. On behalf of Liprie, Mr. Berner offered Dr. Joyner 5 percent of Angiorad, Inc. for an additional $180,000. This offer was made to Drs. Joyner and Harrison, but only Dr. Harrison accepted. Subsequently, by letter dated March 14,1995, Mr. Berner advised Dr. Joyner that the offer for Dr. Joyner to participate in the joint venture was withdrawn. The letter further advised Dr. Joyner, inter alia, that he should not attend the ACC convention in New Orleans and should not identify himself with the project in any way. On March 22, 1995, the medical abstract was presented at the ACC convention and the record reflects that, following publication of the medical abstract, the ICRT received great interest from investors.
| inDr. Joyner filed the current suit on February 8, 1996.[3] Thereafter, on September 6, 1996, United States Surgical Corporation bought the rights to the ICRT from Angiorad, Inc. The only evidence of record reveals that Liprie collected profits totaling $17 million from the technology. *249 Liprie disputes that this entire amount is attributable to the ICRT.
As previously stated, following trial, the jury found that the three doctors entered into an oral agreement which provided Dr. Joyner with 25 percent ownership interest, but that did not require $1.25 million or security therefor. The jury further found that Dr. Joyner satisfied his obligations under the oral agreement and that Liprie had defrauded Dr. Joyner and breached his fiduciary duties as Dr. Joyner’s partner. The jury awarded Dr. Joyner 25 percent of the $17 million in profits received by Liprie, or $4.3 million, plus attorney fees. The trial judge denied a subsequent motion for judgment notwithstanding the verdict urged by Liprie and this appeal ensued.

DISCUSSION

The case sub judice presents a complex and sometimes confusing scenario of the evolution of the so-called joint venture efforts of Liprie and Drs. Joyner and Harrison. This litigation turns on (1) the existence of an enforceable oral joint venture agreement among the three men, (2) the terms | nof such agreement, if confected, and (3) whether Dr. Joyner and/or Liprie satisfied the terms of such agreement or whether Liprie breached the same.
On appeal, Liprie assigns the following errors:
1. The record does not provide a reasonable factual basis to sustain the jury’s determination that Appellee proved the existence, terms and performance of an oral agreement or to justify the trial court’s denial of Appellant’s Motion for JNOV or Alternatively, Motion for New Trial.
2. The record does not provide a reasonable factual basis to support the jury’s determination that Appellant defrauded Appellee or to justify the trial court’s denial of Appellant’s post-judgment motions.
3. The record does not provide a reasonable factual basis to support the jury’s determination that Appellant breached a fiduciary duty to Appel-lee or to justify the trial court’s denial of Appellant’s post-judgment motions.
4. The jury abused its “much discretion” by awarding Appellee $4,300,000 on the basis of the evidence in the record.
5. The jury abused its “much discretion” by excluding evidence of Ap-pellee’s and other witnesses’ out-of-court non-hearsay statements.

Oral Agreement

In his first three assignments of error, Liprie challenges the factual findings of the jury that the terms of the oral agreement between the doctors did not include the security provision, that Liprie defrauded Dr. Joyner and that he breached a fiduciary duty to Dr. Joyner as his partner.
The standard of review to be applied to factual findings in a civil matter is the manifest error standard. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). Under this standard, the reviewing court does not substitute its own judgment for that of the fact finder, but determines whether its findings were reasonable. Hubbard v. Allied Building Stores, Inc., 41,534 (La.App.2d Cir.11/1/06), 942 So.2d 639. Thus, where there are two permissible views of the evidence, neither choice can be manifestly erroneous. Id. The court of appeal, therefore, may not reverse the decision of the fact finder if its conclusions are reasonable in light of the record, even if the appellate court would have reached the opposite conclusion. Id.
*250 When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings. Hanger One MLU, Inc. v. Unopened Succession of Rogers, 43,120 (La.App.2d Cir.4/16/08), 981 So.2d 175. The great discretion accorded to the factual findings of a jury is grounded in the trier of fact’s superior capacity to assess the credibility of the witnesses because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Before determining the terms of the alleged oral agreement, we must first examine whether such agreement was con-fected. If the price or value of an oral contract is in excess of $500, the contract must be proved by at least one witness and other corroborating circumstances. La. C.C. art. 1846. The phrase “other corroborating circumstances” means general corroboration and does not require independent proof of every detail of the agreement. Smith v. Dishman & Bennett Speciality Co., Inc., 35,682 (La.App.2d Cir.1/23/02), 805 So.2d 1220. Whether there are corroborating circumstances sufficient to establish an oral contract is a question of fact. Treen Const. Co., Inc. v. Schott, 03-1232 (La.App. 5th Cir.1/27/04) 866 So.2d 950.
| is As stated, in the case sub judice, the parties state in brief that it is “undisputed” that Liprie and Drs. Joyner and Harrison entered into an oral joint venture agreement. Liprie and Dr. Joyner, however, also argue that they had differing ideas regarding the initial terms of the oral joint venture agreement. If that is the case, the question arises whether there was, in fact, a meeting of the minds resulting in an enforceable agreement. Dr. Joyner maintains, and the jury so found, that the initial agreement did not require contribution of $1.25 million in capital or security therefor. In support of his testimony that there was no security required under the initial oral agreement, Dr. Joyner provided the July 15, 1994 Liprie letter of intent and the subsequent draft of a written partnership agreement, as described hereinabove, both of which contained the security provision and both of which he refused to sign because of that additional term. Significantly, Dr. Joyner notes the actions of Liprie throughout the early phases of the venture, prior to the ACC acceptance of the medical abstract. Dr. Joyner emphasizes that Liprie proceeded eagerly with the venture, accepting the salary paid by Drs. Joyner and Harrison and allowing Dr. Joyner’s participation in testing the technology in the first round of human trials in Caracas and co-authoring the medical abstract. Dr. Joyner further emphasizes that, on several occasions, Li-prie assured him that he would not be required to provide security for $1.25 million. Most notably, while in Caracas awaiting a decision of the Venezuelan doctors as to whether the trial could continue, Dr. Joyner was instrumental in procuring a solution that allowed the project to proceed and was assured at that time that he would be |14included in the project to its end without having to “come up” with any additional security. According to Dr. Joyner, it was not until after the first round of successful trials in Caracas that Liprie became insistent on the furnishing of the $1.25 million or the security therefor. According to Dr. Joyner, it was at that point that Liprie knew that he had the potential to make millions, if not billions, on this technology.
After a complete review of the evidence in this case, we conclude that there exists a reasonable factual basis in this record *251 on which the jury could have concluded that the three men reached an oral agreement, either in late May in Atlanta or in July surrounding the time of the two ‘letters of intent” exchanged among the three men. Liprie’s actions in continuing the project and accepting the benefits of the bargain as described herein provide sufficient, albeit marginally sufficient, evidence of corroborating circumstances sufficient to support the jury’s finding that an oral agreement existed and that security was not required as a term of the agreement.
Significantly, however, we note that, at trial, Liprie introduced the deposition testimony of Dr. Harrison in support of his position on the security requirement. Succinctly stated, Dr. Harrison testified that he entered into the heart project with no expectations of monetary gain. He regarded the project as extremely high risk and testified that he believed from the outset that Liprie did not need his or Dr. Joyner’s participation and that the real value in the project was the technology which was solely owned by Liprie. Dr. Harrison testified that it was his belief from the inception of the venture that he and Dr. Joyner would have to provide $1.25 million or | ]¡¡security therefor before they would obtain an ownership interest in the heart project. He stated:
Sam’s contribution to the deal was that he would place his patents into the company for the aggregate of 1.25 million dollars each for myself and Doctor Joyner for which we would be given twenty-five percent of the company had we funded the 2.5 million dollars total to the company. That was the only thing I ever knew.
Dr. Harrison candidly admitted that he was unable to provide his half of the funding or security and, therefore, had no expectations of ownership. He further testified that Liprie provided several extensions of time within which the security could be provided. Dr. Harrison agreed that he and Dr. Joyner were given until the end of March 1995 to provide funding.
Cognizant of this strong testimony, even if the original agreement had included a requirement of $1.25 million or security therefor from Dr. Joyner, we further conclude that Dr. Joyner satisfied this term of the agreement through Ms. Biwer. Dr. Harrison admitted in his testimony that Liprie gave the doctors until the end of March 1995 to provide the requested security. Ms. Biwer testified that she and Mr. Harter were in discussions with Dr. Joyner regarding the possibility of providing funds for the project on behalf of Dr. Joyner beginning in November 1994. She further testified that she personally spoke to Liprie in December and made him “absolutely” aware that $1.25 million was available to him at his behest. Ms. Biwer testified that Liprie understood that it was security on behalf of Dr. Joyner and that all he had to do was call on it and the money was there. She testified that Li-prie was “excited” about her participation, but never called on 116the funds. Ms. Biwer’s testimony was corroborated by Mr. Harter and Dr. Joyner.
For the foregoing reasons, we find no manifest error in the conclusion of the jury that Dr. Joyner (1) was not required by the terms of the oral agreement to provide the security, and/or (2) Dr. Joyner complied with the terms of the agreement by engaging Mr. Harter and Ms. Biwer to provide the funding/security.

Breach of Fiduciary Duty ¡Fraud

Since the essential elements of a joint venture and a partnership are the same, joint ventures are generally governed by partnership law. Riddle v. Simmons, 40,000 (La.App.2d Cir.2/16/06), 922 So.2d 1267, writ denied, 06-0793 (La.6/2/06), 929 So.2d 1259, citing Broadm- *252 oor, L.L.C. v. Ernest N. Mortal New Orleans Exhibition Hall Authority, 04-0211 (La.3/18/04), 867 So.2d 651. The relationship between joint venturers, like that existing between partners, is fiduciary in character. Riddle v. Simmons, supra. In Riddle, this court explained:
A fiduciary obligation is imposed on all participants of loyalty and the utmost good faith, fairness and honestly in their dealings. The dual requirements of good faith between joint venturers and the principle that a joint venture contemplates a division of all the profits growing out of the transaction among all the venturers forbid one co-venturer from acquiring and retaining for himself any private or secret advantage in connection with the common.
This idea is premised on La. C.C. art. 2809, Fiduciary duty; activities prejudicial to the partnership, which provides:
A partner owes a fiduciary duty to the partnership and to his partners. He may not conduct any activity, for himself or on behalf of a third person, that is contrary to his fiduciary duty and |T7is prejudicial to the partnership. If he does so, he must account to the partnership and to his partners for the resulting profits.
Further, Comment (b) to article 2809 instructs:
This article prohibits activities that are prejudicial to the partnership. The relationship of the partners is fiduciary and imposes upon them the obligation of good faith and fairness in their dealings with one another with respect to the affairs of the partnership. This fiduciary duty continues until the partnership is finally liquidated. This places the partner in a similar relationship to the partnership that a director holds to a corporation and its shareholders.
The fiduciary relationship among partners imposes on them the obligation of the utmost good faith, fairness, loyalty and integrity in their dealings with one another with respect to partnership affairs. Barksdale v. Lincoln Builders, Inc., 32,857 (La.App.2d Cir.6/21/00), 764 So.2d 223, writ denied, 00-2646 (La.2/9/01), 785 So.2d 821. The standard of a fiduciary’s duty to his beneficiary, depending on the facts of the case, lies somewhere between simple negligence and willful misconduct or fraud with the intent to deceive. Id. The actual intent to deceive is not required where one party is placed in such an advantageous position to the other. Id.
A thoughtful review of the testimony herein reveals no manifest error in the jury’s conclusion that Liprie’s belated demand for security in the amount of $1.25 million was in bad faith and prejudicial to the partnership. Dr. Joyner’s testimony suggests that Liprie’s actions were disloyal and placed him in an advantageous position to Dr. Joyner. In that regard, we find that there is a rational basis in the record to support the conclusion that Li-prie’s actions lacked integrity and were more than simply negligent, rising to the level of willful and intentional misconduct. The jury found Dr. Joyner | lsto be credible in his testimony regarding Liprie’s actions and motives and we afford that finding great discretion.
In regard to the finding that Liprie defrauded Dr. Joyner out of his partnership interest in the ICRT, we note that La. C.C. art. 1953 defines fraud as
a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.
For an act to constitute fraud, it must be calculated to produce a mislead *253 ing effect. McCoy v. City of Monroe, 32,-521 (La.App.2d Cir.12/8/99) 747 So.2d 1234, writ denied, 00-1280 (La.3/30/01), 788 So.2d 441. Fraud need only be proven by a preponderance of the evidence and may be established by circumstantial evidence. La. C.C. art. 1957; Hickman v. Bates, 39,178 (La.App.2d Cir.12/15/04), 889 So.2d 1249. The trier of fact’s findings with respect to a claim of fraud are subject to the manifest error rule. Hickman v. Bates, supra, citing Ballard’s Inc. v. North American Land Development Corp., 28,437 (La.App.2d Cir.6/26/96), 677 So.2d 648. We find no manifest error in the jury’s finding of fraud in this case.[4]

Damages

In his fourth assignment of error, Liprie argues that the jury was manifestly erroneous in awarding damages in the amount of 25 percent of the |19total profit he received from the radiation technologies. Liprie cites his testimony regarding the various sources of those profits and argues that not all of those funds are traceable to the “low dose” ICRT project. Dr. Joyner counters by noting that the only testimony as to the source of the $17 million profit was Liprie’s own self-serving evidence. Dr. Joyner suggests that the jury was free to discount the testimony of Liprie in favor of the conclusion that all of the radiation patent technology produced the total profit of $17 million and it was reasonable to fashion the damage award on that figure. We agree.
A fact finder’s determination of damages is also subject to the manifest error standard of review and is entitled to great deference on review. Mayzel v. Gould, 44,081 (La.App.2d Cir.2/25/09), 4 So.3d 979, citing Williams v. Enriquez, 41,200 (La.App.2d Cir.6/28/06), 935 So.2d 269. The total profit from Liprie’s radiation technology, according to his testimony, was $17 million. The jury chose to accept that figure and awarded Dr. Joyner 25 percent of that profit in accordance with his 25 percent ownership share in the joint venture. We find no abuse of discretion in this award.

Exclusion of Tape Recordings

In his fifth assignment of error, Liprie argues that the trial court abused its discretion in excluding certain tape recorded conversations to which Dr. Joyner was a party. The trial court is granted broad discretion in its evidentiary rulings which are not be disturbed on appeal absent a clear abuse of discretion. Allums v. Parish of Lincoln, 44,304 (La.App.2d Cir. 16/10/09),2n 15 So.3d 1117; Crisler v. Paige One, Inc., 42,563 (La.App.2d Cir.1/9/08), 974 So.2d 125. Error may not be predicated on a ruling which admits or excludes evidence unless a substantial right of the party is affected. La. C.E. art. 103(A); Allums v. Parish of Lincoln, supra.
The tape recordings in the instant case were produced by Dr. Joyner in discovery and transcripts thereof were provided to Liprie. A review of the testimony at trial, and particularly the cross examination of Dr. Joyner, reveals that counsel for Liprie questioned Dr. Joyner extensively about *254 the alleged prior inconsistent statements made by him on portions of the tape recordings. In some instances, the conversations contained in the transcripts of the tape recordings were read line by line to the jury. While Liprie argues that the trial court erred in refusing to allow introduction of the entirety of the recordings, because of the thorough use of the prior inconsistent statements for impeachment purposes at trial, we find no abuse of discretion in the trial court’s refusal to admit the tapes. We agree with Dr. Joyner that Liprie’s case was in no way impeded by such refusal and that Liprie has demonstrated no prejudice by the exclusion of the actual recordings. This assignment is without merit.

CONCLUSION

For the foregoing reasons, the judgment in favor of Lee Roy Joyner, M.D., awarding damages in the amount of $4.3 million plus attorney fees is affirmed at the cost of Samuel F. Liprie.
AFFIRMED.
CARAWAY, J., dissents with written reasons.

. At this juncture, we believe it helpful to note that Dr. Joyner testified that he called Liprie by the nickname "Sammie” and that he and Liprie were close friends and had been for years. Dr. Joyner stated that Liprie had even stayed at his home on occasion. This was prior to any business relationship between the two men. Liprie, on the other hand, denied a close friendship with Dr. Joyner, testifying that the two were "acquaintances” over the years, but nothing more.

. There is much argument regarding the timing and correctness of the information provided to Mr. Harter by Dr. Joyner. We are cautious not to place undue focus on these disagreements, as the record clearly shows that Dr. Joyner and Mr. Harter were exchanging information regarding the heart project and Mr. Harter testified that he was very interested in the project and eager to participate, as was Ms. Biwer. Mr. Harter did not testily that he believed he was misled in any way by Dr. Joyner.

. Related claims of Dr. Joyner arising out of the development and promotion of the ICRT against additional defendants were dismissed by the trial court and that judgment was affirmed on appeal by this court in Joyner v. Liprie, 43,233 (La.App.2d Cir.5/7/08), 983 So.2d 257, writ denied, 08-1236 (La.8/29/08), 989 So.2d 108. In addition, as noted in that prior opinion, judgment was rendered in favor of Dr. Joyner and against Liprie concerning a 1993 transaction between them relating to a stock transaction of Omnitron International, Inc., of which Liprie was a founder and director. That judgment was affirmed by this court in Joyner v. Liprie, 39,342 (La.App.2d Cir.3/11/05), 896 So.2d 363.

. Dr. Joyner states in brief that Liprie appears to take issue with the jury charge regarding fraud and breach of fiduciary duty. Mr. Li-prie failed to object to the charge made to the jury and the propriety of the same is not before us on appeal. We simply note that fraud is not an element of an actionable breach of fiduciary duty claim. As stated, the conduct constituting breach of fiduciary duty is more than simple negligence or can amount to willful misconduct or fraud. Barksdale v. Lincoln Builders Inc., supra. As such, even absent fraudulent conduct, the verdict of the jury finding a breach of fiduciary duty is supported by the record.