981 So.2d 175 (2008)
HANGER ONE MLU, INC. Plaintiff-Appellant,
v.
The UNOPENED SUCCESSION OF James C. ROGERS, et al., Defendant-Appellee.
No. 43,120-CA.
Court of Appeal of Louisiana, Second Circuit.
April 16, 2008.
*177 The Herring Law Firm, APLC by Charles Evans Herring, Jr., Brian L. Evans, for Appellant, Hanger One MLU, Inc.
Zebie A. Grayson, for Appellee, The Unopened Succession of James C. Rogers.
Hudson, Potts & Bernstein, LLP by Charles William Herold, III, Monroe, Donald H. Zeigler, III, for Appellees, James R. Rogers, Mollie Rogers, and Rogers Aviation, Inc.
Breithaupt, Dunn, Dubos, Shafto & Wolleson, LLC by Walter C. Dunn, Monroe, for Appellees, Deal Paul "Skip" Amidon and Amidon Aircraft Solutions, LLC.
Before STEWART, GASKINS & DREW, JJ.
DREW, J.
Hanger One MLU, Inc. appeals the judgment rejecting its demands against multiple defendants under an alleged contract for the sale of Rogers Aviation, Inc. Hanger One also sought specific performance of the sale by the defendants and recovery for various services allegedly performed by Hanger One for the defendants. For the following reasons, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND
James C. Rogers, a pilot and president of Rogers Aviation, Inc., died with his two passengers in a plane crash in November 2002. Rogers Aviation leased from the City of Monroe a hangar at the Monroe Regional Airport. Trial evidence indicated that the lease was for a long term and for sought after space at the airport. Hanger One operated a service station for aircraft in a hangar next to the Rogers Aviation hangar.
Hanger One alleged that in September 2002, Hanger One, through its president, T.C. Brown, entered into an oral contract with James C. Rogers and his wife, Mollie Rogers, to purchase all the stock in Rogers Aviation for $20,000.00 at the time of delivery of the stock certificates. Rogers would retain for his lifetime the right to use the facility at no cost to maintain his aircraft. Hanger One was to sell Rogers fuel at cost. If Rogers and Hanger One determined that a stock sale had adverse tax consequences, then all leases and assets (excluding aircraft) would be transferred to Hanger One in lieu of a stock transfer.
According to Hanger One, Mollie (widow of James C. Rogers) and James R. Rogers (Jamie, son) verbally acknowledged the contract for the stock sale following James C. Rogers' death but explained that the sale would be delayed due to possible litigation arising out of the fatal crash and the need to open and close James C. Rogers' succession. Hanger One was not opposed to a reasonable delay but maintained it was prepared at all times to perform its contractual obligations and to pay the purchase price and accept delivery of the stock.
On March 29, 2005, Hanger One sued the succession representative of the Unopened Succession of James C. Rogers, Mollie Rogers, Jamie Rogers, and Rogers Aviation, Inc. ("Rogers defendants"). Hanger One also sought payment under an alleged oral contract with Jamie and Mollie Rogers for recovery and storage of the plane wreckage and for maintaining the Rogers Aviation hangar and aircraft during litigation arising out of the crash. Specifically, Hanger One demanded: *178 

 Wreckage recovery $1,600.00
 24 months' storage fees $6,000.00
 24 months' maintenance of hangar/planes $6,500.00
 8 engine startups $2,000.00

Hanger One asserted that the agreement was that Hanger One would not charge for maintaining the hangar and aircraft as long as the sale was completed in a reasonable time. Storage fees were to be applied to the purchase price as a "down payment."
The Rogers defendants settled the pending litigation concerning the crash and that suit was dismissed on December 1, 2004. In demanding specific performance, Hanger One contended that despite amicable demand, the Rogers defendants failed and/or refused to transfer the stock and the assets of Rogers Aviation.
In their answer, the Rogers defendants admitted that the lawsuit (Noelle Woodard v. the Succession Representative of the Succession of James C. Rogers) concerning the fatal crash was dismissed with prejudice on December 1, 2004. Further, the Rogers defendants alleged there was never a contract between Hanger One and any of the defendants nor was there a verbal contract among the parties for the services for which Hanger One sought recovery.
In amended petitions, the claimants added as defendants Dean Paul "Skip" Amidon and Amidon Aircraft Solutions, the ultimate purchaser of Rogers Aviation from the Rogers family.

TRIAL COURT'S REASONS FOR JUDGMENT
Because it was undisputed that parol evidence could not be used to establish liability against the estate of James C. Rogers or against his heirs, the claim against the unopened succession was dismissed at the start of the bench trial. Parol evidence of statements by the decedent was determined to be admissible to establish a debt of Rogers Aviation or the consideration of a debt of Rogers Aviation, Jamie and Mollie Rogers and/or Jamie and Mollie Rogers individually. The trial court found credibility determinations to be critical in the case in which a vital issue was whether the decedent was acting in his corporate and/or individual capacity.
Testifying for Hanger One, Brown stated that they had a deal and at the beginning of the following year, both parties were to investigate the tax and liability consequences resulting from carrying out the transaction as an asset sale or a stock sale. The court rejected Hanger One's assertion that the parties had a meeting of the minds because each may have reached opposite conclusions about the best way to perfect the sale.
The trial court determined the any of decedent's statements were more likely than not made for initial discussions about some possible sale in the future. James C. Rogers had previously discussed selling his business but had never agreed to the final step. The decedent never discussed a sale with his wife, Mollie, to whom he confided all the time. Nor did the decedent discuss the sale with his attorney or his CPA. The trial court found that there was "no credible evidence that Mr. Rogers made any statements that could be interpreted as a meeting of the minds as to an agreement to sell."
Hanger One failed to establish that decedent's statements were in a corporate capacity. The decedent's statements were personal, not in a corporate capacity. In addition, there was no credible evidence at all that Mr. Rogers made the statements.
Concerning the sale allegedly agreed to by Mollie or Jamie Rogers after the crash, the court heard conflicting testimony. There was confused testimony at the end of the trial that Mollie Rogers agreed to *179 make an offer of $52,000.00 or $55,000.00 to Hanger One. There was no meeting of the minds for a sale at $20,000.00 or $30,000.00. While Mollie and Jamie did tell Brown that they would give him the first opportunity to buy the stock or the lease, the evidence showed this was an experienced, sophisticated businessman dealing with the inexperienced widow and son of his recently deceased friend. There was no evidence that the Rogers family intended to be legally bound or to contract a right of first refusal.
Hanger One failed to carry its burden to prove entitlement to a claim for unjust enrichment or detrimental reliance. Hanger One's belated claim for services arose "only in aggressive negotiations in a counter offer" to the Rogers defendants' $52,000.00 offer. Brown's motives in attempting to persuade the family to accept a lesser amount insulted the Rogers family, who possessed a much sought after item, a hangar lease at the Monroe airport.
The trial court concluded that Brown offered his friendship and help gratuitously. He refused offered payments or took only some payments. Brown led Jamie to believe that his assistance was a donation with no strings attached and done to help the widow of his friend at her time of need. Brown gratuitously supplied services which cost him very little, since Hanger One's employees were on its payroll and did the work for Rogers Aviation when they were not busy with Hanger One work. Hanger One failed to prove unjust enrichment or detrimental reliance.

DISCUSSION
On appeal, the reviewing court may not set aside a trial court's factual findings in the absence of manifest error or unless they are clearly wrong. Where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Even though an appellate court may feel its own evaluations and inferences are more reasonable than those made by the trial court, reasonable evaluations of credibility and reasonable inferences of fact are not disturbed on appeal where conflicting testimony exists. To reverse a trial court's factual determinations, the appellate court must find that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings. See discussion in Green v. Nunley, 42,343 (La.App.2d Cir.8/15/07), 963 So.2d 486.
Under Louisiana law, the formation of a valid and enforceable contract requires capacity, consent, a certain object, and lawful cause. The court must find there was a meeting of the minds of the parties to constitute consent. The existence or nonexistence of a contract is a question of fact which will not to be disturbed by the appellate court unless clearly wrong. Chapman v. Ebeling, 41,710 (La.App.2d Cir.12/13/06), 945 So.2d 222.
Alleged Agreement Between Brown and James C. Rogers Prior to His Death
Brown contended that after two or three months of general discussions, he and the decedent reached an agreement in September 2002. Brown stated that the method of transfer was to be decided by mutual agreement after determining tax and liability consequences. Brown and the decedent did not make that decision before James C. Rogers was killed. Brown acknowledged that there were no letters or writings documenting their alleged agreement *180 and that he did not contact his accountant or lawyer about the matter.
Brown's wife, the sole shareholder of Hanger One and bookkeeper for the business, testified that she heard the decedent and her husband negotiating the sale and that she heard discussions of a $20,000.00 price. At trial she stated her husband told her the details of the transaction after the deal was made. At an earlier deposition, she said she never overheard the parties discussing a price and that Brown did not reveal the details of the agreement with her.
Rogers' widow testified that she and the decedent had been married 43 years at his death and that she was his confidante. On occasions when he discussed selling the hangar, he informed her. If he had contemplated selling to Hanger One, Mrs. Rogers said that the decedent would have talked to her, his CPA, and his attorney, none of whom heard him discuss it. The widow and other witnesses said that the decedent loved to buy and sell things and frequently talked about possible deals.
William Randall Beckham, a close friend of the decedent, testified that he kept his plane in the Rogers Aviation hangar. The decedent did not discuss selling the business to Hanger One with his friend. Had Rogers been seriously thinking of selling the business, Beckham opined that the decedent would have informed him because Beckham would have been left with no place to keep his own airplane by such a transaction.
Hanger One argued that the trial court erred in concluding that there was no "meeting of the minds" between Brown and the decedent. Both sides were to consult their experts regarding tax and liability consequences. The trial court correctly noted that the unreached "mutual decision" by Brown and the decedent regarding the form of the alleged sale could have resulted in conflicting conclusions.
In addition the claimants are not aided by seeking to characterize the transaction as an alternative obligation for a sale of corporate stock or a transfer of the corporate assets. La. C.C. arts. 1808 and 1809. Brown's testimony was that both sides were to evaluate and determine the most advantageous means of accomplishing the alleged sale.
An examination of the nuances of alternative obligations is not necessary. The trial court specifically found that Hanger One failed to prove that Brown and the decedent made a contract to sell. Further, any statements by James C. Rogers prior to his death were more likely than not made as initial discussions about some possible future sale. After hearing the conflicting testimony, the trial court found that there was no evidence that the decedent made any statements that could be interpreted as a meeting of the minds as to an agreement to sell. Finally, the trial court found no credible evidence that ever Rogers made the alleged statements.
Alleged Contract Between the Rogers Family and Hanger One, after the Crash
According to Hanger One, the trial court also incorrectly found that it did not prove that Mollie Rogers (individually and on behalf of Rogers Aviation) and Jamie Rogers (individually and as agent for Mollie) agreed to sell the hangar lease to Hanger One for $20,000.00.
Brown gave contradictory testimony about when he initially discussed the sale with Jamie. After first stating that they did not discuss the matter at their initial meeting in November 2002, three or four days after the funeral, Brown said that they reached an agreement at the initial meeting. Brown testified that he told Jamie he would help retrieve and store the wreckage, maintain the hangar and aircraft *181 and serve as a consultant in litigation arising from the crash, with the understanding that those services would be applied against the purchase price.
Brown testified he informed his lawyer he wished to move forward with the purchase. Brown acknowledged the July 2, 2003, letter from his attorney to the attorney representing the Rogers estate, stating that Brown and the decedent had a verbal agreement that Brown or Hanger One would buy all the stock in Rogers Aviation. Due to the possibility of litigation concerning the crash, Hanger One's attorney had advised Brown not to purchase the corporate stock and informed the Rogers family's estate attorney that Brown wanted to acquire the lease by assignment. The letter also stated, "Prior to Mr. Rogers' death, they had discussed a price of $20,000.00," but did not contain a definite price.
Brown also asserted that he and Jamie discussed other prices. Hanger One placed into the record a February 21, 2005, letter from Hanger One's attorney to the Rogers family's estate attorney, which detailed Brown's version of the talks beginning with the asserted pre-crash agreement with the decedent for a purchase price of $20,000.00. Later, Jamie allegedly said the family wanted $37,500.00 for the business and Brown countered with a modified offer of $30,000.00. After Brown received Jamie's $52,000.00 offer in early 2005, he responded with a January 7, 2005, letter to the widow stating the price was unclear and asking her to contact him if she wanted to sell. That letter was accompanied by a bill for services. The February 21, 2005 letter concluded with a demand that the Rogers defendants sell Rogers Aviation for $30,000.00 and that Hanger One would not pay $55,000.00.
Mrs. Brown testified that she met Mrs. Rogers at the funeral home visitation and the widow acknowledged the decedent enjoyed visiting the Browns at the airport with no discussion about the business arrangement alleged by Hanger One. At her earlier deposition, Mrs. Brown reported that the widow said her husband "loved coming down there. He said I know that y'all was . . . we were fixing to do a deal on the hangar . . ."
At trial, Mrs. Rogers emphatically denied making such a statement about a pending business transaction at the visitation prior to her husband's funeral. She also directly contradicted the testimony of another Hanger One witness who said he phoned within a week of the crash at which time Mrs. Brown informed him that she had arrangements to sell to Brown. The widow explained that she took no phone calls in the days following her husband's death and did not have that conversation.
The widow testified that Brown visited her in her home many times following the death of her husband but there was never any discussion of a $20,000.00 price. She knew Jamie was talking to Brown but she had not authorized him to act for her. After consulting with her accountant, she authorized Jamie to offer Hanger One the price of $52,000.00, which he did in early January 2005.
After learning that Brown had information about the crash which killed his father, Jamie testified he went to see Brown a few days after the funeral to obtain information. Jamie testified there was no discussion concerning an agreement between Brown and his late father and no mention of a $20,000.00 purchase price. Jamie denied telling Brown he knew about the alleged agreement and planned to honor his father's wishes.
According to Jamie, Brown began discussing the possibility of buying the hangar about a month later. Jamie testified *182 he had no authority to negotiate and any discussions were premature, pending resolution of the crash litigation. Hanger One placed into evidence a package sent by Jamie to Brown with a cover letter dated January 14, 2003, stating:
TC this is a copy of Leases and other papers you may want to review before the close of sale of Rogers Aviation, Inc. to you. Thanks for your help, talk to you soon. James Rogers
Jamie explained that Brown raised questions he could not answer and he gathered and sent the paperwork for Brown to examine.
After the settlement of lawsuit over the plane crash, his mother authorized Jamie in early January 2005 to make an offer of $52,000.00 for Hanger One to purchase the hangar. Brown informed Jamie he would have to run the offer by his wife. Brown followed with a letter dated January 7, 2005, in which he stated he had talked with Jamie and the attorney for the succession about Hanger One purchasing the Rogers Aviation hangar and lease. Brown stated: "The price is not clear to me so if you have any interest in selling, please contact me." Attached to the letter was the invoice totaling $17,708.39 (including 9.9% sales tax) which Brown stated could be deducted from the purchase price. This was the first time Brown had indicated that he expected payment for the services. In February 2005, Mrs. Brown received a letter through her attorney in which Hanger One's lawyer stated that Brown was unwilling to pay the $55,000.00 price.
Through Jamie, Mrs. Rogers contacted Skip Amidon in January 2005 to get help with the hangar and aircraft. She later offered the hangar to him at the same price. The agreement with Amidon was not made until two or three months later, long after the January 7, 2005, letter and invoice and the February 2005 letter refusing to pay the sought price.
The record establishes that while Jamie and Brown discussed a possible sale, no agreement had been reached nor could a sales contract have been made. Jamie was not authorized by his mother to act until she directed Jamie to convey her $52,000.00 sales price to Brown in early January 2005. After assessing the credibility of the witnesses, the trial court reasonably inferred from all the evidence that the Rogers defendants made no sales agreement with Hanger One after James C. Rogers' death.
Alleged Right of First Refusal
Hanger One complained that the trial court abused its discretion in deciding that the Rogers family did not give Hanger One a right of first refusal to purchase Rogers Aviation. In Hanger One's view, the Rogers family agreed to give Hanger One the first chance to buy the hangar lease, but the Rogers defendants never made a firm offer to Hanger One, pointing out the confusion as to the price sought. Hanger One is not assisted by citing Robichaux v. Boutte, 492 So.2d 521 (La.App. 3d Cir.1986), writ denied, 496 So.2d 352 (La. 1986), in which Mrs. Boutte included in the deed itself the right of the vendee to be given "the first preference in the purchase" of her adjacent residence if and when she decided to sell it. That right of first refusal was particular in requiring an offer to the vendee of the property at the highest bona fide offer among other provisions. A right of first refusal would not necessarily have to be in writing. However, the facts of Robichaux were so different as to make that analysis of the deed provision irrelevant here.
The Hanger One argument is belied by the January 7, 2005, letter sent by Brown to Mrs. Rogers in which he stated that the price was not clear and asked her to contact *183 him "if she had any interest in selling." The omission of any reference to the alleged right of first refusal is both glaring and instructive. Pointing out the obligation of the Rogers family to give Hanger One the right of first refusal would have been crucial if such an agreement had been made. Likewise, the February 21, 2005, letter from Brown's attorney to the representative of the Rogers estate states Hanger One would not pay $55,000.00 but was ready to pay $30,000.00. No mention was made of an alleged right of first refusal.
The widow acknowledged that because Brown had been so helpful, they intended to give Hanger One the opportunity to buy stock or the hangar lease if and when they decided to sell. The trial court found credible testimony that they did "tell Mr. Brown in a friendship way that they would give him the first chance or opportunity to buy." Mrs. Rogers stated on Brown's many visits to her home, they discussed mainly the crash and she became aware he wanted to buy the hanger. She let him know he would be given the first chance when and if she decided to sell. Further, she had no idea of its value, which she intended to investigate. She did not authorize Jamie to negotiate with Brown until she directed her son to make the $52,000.00 offer to Hanger One.
Jamie confirmed that he and his mother intended to talk to Brown first, if and when they sold the business. Jamie also testified that he did not ever tell Brown that he would have the opportunity to match any other offers received on Rogers Aviation. When Jamie made the $52,000.00 offer to sell authorized by his mother, there were no other offers from potential purchasers. The Rogers defendants reached their agreement with Amidon Aviation later.
The trial court rejected Brown's assertion that the Rogers family gave Hanger One a right of first refusal to purchase Rogers Aviation, finding no credible evidence that the widow and son had any intent to be legally bound or to enter into a contract with Brown. We find no abuse of discretion in the trial court's conclusions.
Unjust Enrichment and Detrimental Reliance
Also characterized as an abuse of discretion was the trial court's decision that Hanger One had not met its burden of proving claims for unjust enrichment and detrimental reliance. La. C.C. art. 2298 provides, in pertinent part:
A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.
The comments to art. 2298 state that a person is enriched when his patrimony is increased or his liabilities diminish. Likewise, a person is impoverished when his patrimony decreases or his liabilities increase. There much be a direct or indirect causal connection between one person's enrichment and another person's impoverishment.
For the detrimental reliance claim, Hanger One cited La. C.C. art.1967 which states:
A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the *184 expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.
Shortly after his father's death and funeral, Jamie learned that Brown had flown over the crash site and went to Brown for information. Brown offered to assist in recovering the wreckage and no mention was made of charges. Jamie assisted in the removal of the wrecked plane on a trailer belonging to late father. Jamie thought the plane was to be sold for scrap and told Brown to keep the salvage funds and the trailer. Jamie testified Brown refused his offer to pay for Brown's labor and expenses and never mentioned storage or storage fees to Jamie. Jamie made no request to Brown for cleaning the hangar or for consultation work and Brown never told Jamie that services for maintenance of planes and hangar would be set off against a purchase price.
Mrs. Brown testified that she never requested assistance from Brown or asked him to store the wreckage. The widow said that she offered to pay Brown for any expenses and for removal of the plane from the crash site. She stated she did pay cash on two or three occasions for Hanger One's mowing around the Rogers Aviation hangar. Brown never requested payment or said he was going to charge her for the services which she believed were given gratuitously to aid the grieving family. The first time she knew Brown wanted payment was the letter and invoice dated January 7, 2005.
Brown assisted the Rogers family in recovering and storing the wreckage and maintaining the Rogers Aviation hangar and aircraft. When he discovered that the Rogers family would not sell the facility for the low price he had in mind, Brown decided to bill the family for services Hanger One had rendered. Finding that Brown offered the help gratuitously, the trial court concluded that Brown's purpose was to aggressively negotiate a counteroffer to the Rogers family's proposal to sell the facility for $52,000.00 with the motive of persuading them to accept a lesser amount. As the trial court noted, the aggressive negotiation insulted the family which directed that further communication be through the Rogers defendants' attorney. Once again, we find no fault in the trial court's findings and credibility determinations of the conflicting and, at times, diametrically opposing accounts of what transpired.

CONCLUSION
After hearing all the contradictory testimony, considering the objections and weighing the evidence, the trial court made appropriate credibility determinations and well-grounded inferences of fact. Our review reveals that reasonable factual bases are contained in the record and that the trial court's credibility determinations and factual inferences do not contain clear error. Giving great deference to the trial court's assessments of the witnesses' credibility, we find that the trial court did not abuse its vast discretion in correctly resolving this dispute.

DECREE
The judgment of the trial court is affirmed in all respects and costs are assessed against Plaintiff/Appellant, Hanger One MLU, Inc.
AFFIRMED.