CARAWAY, J.
 

 | ,This action concerns a family dispute between two brothers over their mother’s tract of land. In 1996, the mother executed an act of sale to one son, now a defendant. The defendant admits that no price was paid for the property and no sale occurred, but he defends the action claiming that a disguised donation was intended by his mother. In 1999, the mother made a second transfer of the property to the other son, the plaintiff, which she executed in the form of a donation. The plaintiff now claims that the 1996 sale to his brother was an absolute nullity and that a subsequent donation of a portion of the land by his brother to their cousin, also a defendant, should likewise be annulled. The trial court determined that the 1996 sale transaction was a disguised donation and ruled in favor of the defendants. Finding manifest error in the ruling, we reverse.
 

 Facts and Procedural History
 

 This action between two brothers, Alfred L. Mathews, Jr. (“Alfred”) and Emmett A. Mathews (“Emmett”), concerns a disputed 1996 sale of land (hereinafter the “Sale”) by their now deceased mother, La-vada Gilbert Mathews (“Mrs. Mathews”), to Emmett. Alfred asserts that the Sale was an absolute simulation. In 1997, Emmett donated an undivided one-half interest in the land to his cousin, Charles R. Gilbert (“Rusty”), and as a result, Rusty is included in the action as a defendant. In
 
 Mathews v. Mathews,
 
 35,984 (La.App. 2d Cir.5/8/02), 817 So.2d 418 (hereinafter
 
 “Mathews
 
 /”), we reversed a summary judgment granted in Rusty’s favor after a determination that he, as a donee, was not a protected third party |2under the principles of recordation and was therefore subject to Alfred’s claim of the absolute nullity of the Sale.
 

 The land in question consists of 51 acres (hereinafter the “Farm”) and was acquired by Lavada Gilbert Mathews, wife of Alfred Mathews, Sr., in 1971. This parcel, and the Mathews’s house in the Town of
 
 *740
 
 Hodge, were described as community property in Mr. Mathews’s succession in 1980. The judgment of possession recognized his widow, Lavada, as the surviving spouse in community, the owner of her undivided one-half interest in the community and usufructuary. Their two children, Alfred and Emmett, were recognized as the sole heirs and naked owners of the property, subject to their mother’s usu-fruct.
 

 Subsequently, the Mathews family members executed the following instruments transferring title to the Farm and the house:
 

 • Alfred and Emmett donated their one-half interest in both tracts of land to Lavada by authentic act dated December 26, 1985;
 

 • Lavada donated the house valued at $65,000 to Emmett reserving a lifetime usufruct by authentic act dated January 25,1994.
 

 The disputed Sale of the Farm occurred on January 22, 1996, and was executed on a cash sale deed by both Mrs. Mathews and Emmett as an authentic act. The price was recited in the instrument as $2,000 “and other good and valuable consideration.” Acting as the notary for the Sale was Bobby L. Culpepper, an attorney who testified as a witness in the trial of this case. Emmett has now stipulated that the price was not paid to his mother and the Sale was simulated. However, he asserts that the transaction [3was in actuality a relative simulation or disguised sale in which his mother intended to donate the Farm to him.
 

 Following the Sale, and Emmett’s donation to Rusty on June 15, 1998, Emmett and Rusty partitioned the Farm into two tracts. Rusty testified that he grew up in the house on the Farm and also lived at his Aunt Lavada’s house with his grandmother (Mrs. Mathews’s mother) after his father died at a young age. The northerly portion consisting of 26.5 acres was acquired by Emmett, and the southerly portion with a dilapidated farm house containing 24.5 acres, went to Rusty.
 

 One month prior to this partition between Emmett and Rusty, a Ruston attorney representing Mrs. Mathews wrote a letter to Emmett under the caption, “Suit to set aside deed.” Threatening legal action by Mrs. Mathews, the May 19, 1998, letter states:
 

 Mr. Mathews, there are actually two separate matters with which we are dealing, the invalid deed by your mother and the interest your brother has in the inherited property. Further, there are complications that have arisen with your purported donation and lease. If suit is filed, there will be other parties who will have to be brought into the proceedings, all of which will lead to great cost, financial and otherwise, on the part of many, including yourself.
 

 At the latest visit you had with your mother, you indicated that you were “going to clear things up shortly;” however, nothing has happened.
 

 This letter, which was copied to Lavada and Alfred, was filed into evidence at trial.
 

 On December 8, 1999, Mrs. Mathews executed an Act of Donation purportedly donating a full ownership interest in the Farm to Alfred by an authentic act of donation passed before Culpepper. Alfred had appeared |4before a Delaware notary public and two witnesses and signed the instrument accepting the donation six days earlier, on December 2, 1999. The donation was filed in Jacks on Parish on December 13, 1999, the same day Alfred brought this action against Emmett and Rusty to nullify the 1996 Sale, the 1997 donation to Rusty and the 1998 partition of the Farm.
 

 
 *741
 
 On May 26, 2000, Mrs. Mathews executed a revocation of her donation of the Farm to Alfred. Emmett testified that he accompanied his mother to Culpepper’s office, where Culpepper notarized the revocation of the donation to Alfred on the following grounds:
 

 Donor made said donation to Donee at Donee’s insistence and for the consideration that Donee would not file litigation against his brother, Emmett A. Mathews. When in fact, Donee did the opposite after the donation was secured by Donee as per suit filed in the records of Jackson Parish, Louisiana, styled
 
 “Alfred L. Mathews v. Emmett A. Mathews, et al, No. 27,575
 
 ” records of Jackson Parish, Louisiana all of which constitutes cruel treatment as per Louisiana Civil Code Article 1560.
 

 In spite of Mrs. Mathews’s inter vivos donation to Alfred, his petition prayed that ownership of the Farm be recognized in his mother upon nullification of the Sale to Emmett.
 

 In June 2000, Mrs. Mathews, then age 91, gave her deposition in this case at Pine Hill Nursing Home. She testified as follows concerning the 1996 deed:
 

 Q. Did you know that you sold the farm to Emmett?
 

 A. No, I didn’t sell it.
 

 Q. In [the deed]?
 

 A. I didn’t sell it.
 

 Q. At the top it says cash sale deed. It says this sale is made for the consideration of two thousand dollars cash in hand paid.
 

 A. Well, it wasn’t paid.
 

 Q. You never received it?
 

 IsA. No.
 

 Q. Mrs. Mathews—
 

 A. No good.
 

 Q. Ma’am?
 

 A. It’s no good.
 

 Q. What was no good?
 

 A. We didn’t, we didn’t do the sale.
 

 Q. You didn’t?
 

 A. No.
 

 Q. What did you do?
 

 A. We just didn’t do it.
 

 Q. When you say that you didn’t do it—
 

 A. We didn’t sell it.
 

 Q. Did you donate it to Emmett?
 

 A. No. I’m tired of this.
 

 [[Image here]]
 

 Q. Mrs. Mathews if you will refer to [the deed], which is this document here. By signing [the deed], did you intend, what did you intend?
 

 A. All I know, I want them to have their parts, their equal part, I wasn’t trying to beat them out of nothing.
 

 Q. When you say their equal part, you’re referring to Emmett, Al & Rusty?
 

 A. Yes.
 

 Q. Each was to own a third?
 

 A. Well, there wasn’t no division.
 

 Q. Each was to own a third of the property?
 

 A. I don’t remember how, it was already divided up some way or another. It’s on the record somewhere.
 

 Q. How do you think it’s divided up?
 

 A. Well, both of my sons are suppose to get equal parts and Rusty is suppose to get the house part, so he could keep up the repairs, so they wouldn’t have to have the expense on it.
 

 Q. When you say the house part, you’re referring to the home place on the farm?
 

 A. On the farm. He would take care of the repairs and everything on, where
 
 *742
 
 the house is, so they wouldn't have the expense. They still have, own their part of the land and everything.
 

 * * *
 

 Q. Okay. Mrs. Mathews, do you remember that document that I showed you, and I asked you if you sold the farm to Emmett?
 

 A. I didn’t sell it to him.
 

 Q. And what did you do?
 

 A. All I know, he was suppose to take care of it, but he, he wasn’t trying to own it himself, all of it.
 

 [[Image here]]
 

 A. Suppose to be share.
 

 IsQ. It was suppose to be shared between Al, and Emmett and Rusty?
 

 A. Yes.
 

 Mrs. Lavada Mathews died on February 18, 2001.
 

 At trial, all of the parties testified, along with Culpepper. In his testimony, Culpep-per stated that he “knew Lavada well.” He prepared the 1996 Sale pursuant to her instructions, and acted as the notary for that instrument and other later transactions which affected the property. Cul-pepper testified as follows:
 

 Q. Okay. Uh — at whose request did you prepare that deed?
 

 A. Well the parties came in the office, Mrs. Mathews and Emmett Mathews came into my office.
 

 Q. Okay. And what did Mrs. Mathews ask you to do?
 

 A. There was some problem going on somewhere I don’t remember what it was, but she said she wanted to give this property to Mr. Mathews, to her son, I believe.
 

 Q. Okay, that was Emmett?
 

 A. Emmett, whoever Emmett is.
 

 Q. Okay. And did you counsel with her as to how she should do that?
 

 A. She wanted it done in the form of a cash sale deed although there was no money was changed hands. She was donating it to him but then she had in her idea that she wanted it done like this and I explained to her that this would actually be a donation in disguise. But I did it the way she wanted it prepared.
 

 In his testimony, Emmett stated as follows:
 

 [I]n '96 I assumed possession of it [the Farm] and in order to relieve her of any cost insurance wise and maintenance wise to help her financially and to attempt to more or less keep the farm in the name of Gilbert and Mathews and in a complete packet of 51 acres to be descended down to future relatives.
 

 According to his testimony, Emmett thought he was to pay his mother $2,000 when the 1996 deed was executed, but she refused it. Thereafter, he paid the taxes and “made sure somebody was living on the farm.” The evidence indicates that in 1996, Emmett was not living in Louisiana. 17Emmett testified he leased the farmhouse to his cousin, Lonnie Ray Clark, who was already living there previously. Rusty testified that Lonnie Ray Clark had lived in the farm house from sometime in the 1980s until 2005. Exhibits consisting of a lease to Clark and a lease cancellation were not introduced, but Emmett referred to them in his testimony to describe his dealings with the Farm.
 

 Following the trial, the trial court handed down written reasons, finding that Emmett A. Mathews owned the 26.5-acre tract and Rusty and his wife owned the 24.5 acre tract previously partitioned, together comprising the Farm. The trial court found, “the testimony of Bobby Cul-pepper was crucial showing donative intent of Lavada Gilbert Mathews,” and found
 
 *743
 
 that defendants established that the 1996 deed was thus valid as a disguised donation. The trial court discounted Mrs. Mathews’s deposition testimony, stating:
 

 In examining Mrs. Lavada Gilbert Mathews’s deposition, it becomes obvious that she didn’t want to be there. In fact a letter from her Doctor is attached to the deposition indicating it would be detrimental to her health to participate. Alfred Mathews, Jr. and Rusty Gilbert were present at the deposition which may have made her uncomfortable about her testimony in her deposition. Her age, agitation for being involved, presence of parties plaintiff and defendant, and the fact that the transaction in question occurred more than four years ago, indicates to the Court that her deposition testimony as to her intent in the Act of Sale is of little value.
 

 The trial court judgment declaring defendants the respective owners of the two tracts was signed on March 6, 2008. Alfred appeals the judgment.
 

 \ ¡¡Discussion
 

 The Civil Code defines a simulation as follows:
 

 A contract is a simulation when, by mutual agreement, it does not express the true intent of the parties.
 

 If the true intent of the parties is expressed in a separate writing, that writing is a counterletter.
 

 La. C.C. art. 2025. The simulation can be a feigned or pretended sale clothed in the formalities of a valid sale.
 
 Russell v. Culpepper,
 
 344 So.2d 1372, 1377 (La.1977).
 

 The Civil Code defines two types of simulations. Article 2026 provides:
 

 A simulation is absolute when the parties intend that their contract shall produce no effects between them. That simulation, therefore, can have no effects between the parties.
 

 This contrasts with a relative simulation, where the parties intend that their contract produce effects between them which are different from those recited in their contract. La. C.C. art. 2027.
 

 The Civil Code’s writing requirement for the sale or transfer of immovable property states that “an authentic act” or “act under private signature” must be executed by the parties. La. C.C. arts. 1839 and 2440. Article 1839 places that requirement in the chapter on “Proof of Obligations” and is followed in that same chapter by Louisiana’s parol evidence rule, Article 1848, which provides:
 

 Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature. Nevertheless, in the interest of justice, that evidence may be admitted to prove such circumstances as a vice of consent, or a simulation, or to prove that the written act was modified by a subsequent and valid oral agreement.
 

 | oAs recognized in the jurisprudence before the addition of the new exception for simulations in Article 1848, another basis for the allowance of parol/extrinsic evidence to resolve a dispute between the parties to a relative simulation is the Civil Code’s provision concerning an untrue expression of cause. Article 1970 states the principle as follows:
 

 When the expression of a cause in a contractual obligation is untrue, the obligation is still effective if a valid cause can be shown.
 

 The jurisprudence allowed that “the motive or real consideration can always be established by parol evidence,” and that “the cause of a contract is always open to proof explanatory of its nature, as between the parties.”
 
 Love v. Dedon,
 
 239 La. 109, 118 So.2d 122 (1960).
 

 
 *744
 
 The jurisprudence has allowed the consideration of extrinsic evidence for the determination of a disguised donation made in the form of a written sale of an immovable where no price was paid.
 
 See, Moore v. Wilson,
 
 34,135 (La.App. 2d Cir.11/3/00), 772 So.2d 373 (deed stating nominal consideration in authentic form was invalid as disguised donation because evidence failed to establish grantor’s donative intent);
 
 Nofsinger v. Hinchee,
 
 199 So. 597 (La.App. 1941)(deed conveying interest in family farm for a stated price of $1,000 was upheld as a valid donation when executed as an authentic act and with extrinsic evidence showing intent);
 
 Wood v. Mavtin,
 
 2 So.2d 665 (La.App.1941) (authentic act of sale reciting nominal consideration invalid as donation because donee failed to accept donation and did not possess the property);
 
 Reinerth v. Rhody,
 
 52 La. Ann.2029, 28 So. 277 (1900) (deed transferring immovable for $1.00, valid as a donation).
 

 |inAs in the present dispute, these cases did not involve claims by forced heirs concerning collation and the protection afforded forced heirs to establish purported sales as disguised donations under Civil Code Article 2444. These cases demonstrate mixed results with no significant fact, such as possession of the immovable, singled out as controlling for the establishment of the intention of the parties to the feigned sale. In
 
 Reinerth,
 
 it is unclear what part the possession of the “donee” played in its decision to uphold the transaction as a disguised donation, even though the court’s conclusion was expressed as follows:
 

 [The act of sale] may yet be held valid as a donation when it contains all the requisite formalities and the donee at once goes into possession....
 

 28 So. at 279. The requisite formality is the authentic act requirement of Civil Code Article 1536
 
 [1]
 
 which is designed to diminish any undue or fraudulent influence on the donor’s action by the direct participation of the notary. See,
 
 Frazier v. Frazier,
 
 499 So.2d 229 (La.App. 2d Cir.1986),
 
 writ denied,
 
 500 So.2d 412 (La.1987), citing 3 M. Planiol,
 
 Traite élémentaire de droit civil,
 
 no. 2526 (11th ed. La. State L. Inst. transl.1959).
 

 The ruling in
 
 Nofsinger, supra,
 
 is most pertinent to this case because the parties to the simulated sale transaction gave conflicting testimony of their intentions and the notary who prepared and notarized the “sale” also testified. Unlike the present case, however, the notary was also the attorney for the succession of the plaintiffs’ mother and the dispute centered around |nhis legal advice given to all the parties upon the execution of the transaction. The decedent in her will had bequeathed a tract of land to her niece, the defendant, and the defendant’s children. Although the bequest indicated that the defendants were to receive complete ownership of the tract, the decedent only owned a one-half interest in the tract with the plaintiffs owning the other one-half. The attorney who represented all the parties testified that he prepared the “sale” because of plaintiffs’ desire to see that their mother’s wishes were carried out and that defendants receive complete ownership of the tract of land. The parties had therefore gathered in the attorney’s office where the instrument was reviewed and the motive for the act as it related to the decedent’s bequest was discussed. Despite the plaintiffs’ later denial of their understanding of the simulated transac
 
 *745
 
 tion,
 
 [2]
 
 the court gave effect to the parties’ act, construing the transaction as the plaintiffs’ donation motivated by their intentions to comply with their mother’s desire.
 

 The Civil Code Articles concerning inter vivos donations, which must be considered for Emmett’s assertion of a disguised donation, provide as follows:
 

 La. C.C. art. 1467.
 

 Property can neither be acquired nor disposed of gratuitously, unless by donations
 
 inter vivos
 
 or
 
 mortis causa,
 
 made in the forms hereafter established.
 

 112La. C.C. art. 1468.
 

 A donation
 
 inter vivos
 
 (between living persons) is an act by which the donor divests himself, at present and irrevocably, of the thing given, in favor of the donee who accepts it.
 

 La. C.C. art. 1540.
 

 A donation
 
 inter vivos
 
 shall be binding on the donor, and shall produce effect only from the day of its being accepted in precise terms.
 

 The acceptance may be made during the lifetime of the donor by a posterior and authentic act, but in that case the donation shall have effect, with regard to the donor, only from the day of his being notified of the act establishing that acceptance.
 

 La. C.C. art. 1541.
 

 Yet, if the donation has been executed, that is, if the donee has been put by the donor into corporeal possession of the effects given, the donation, though not accepted in express terms, has full effect.
 

 In addressing a dispute concerning the validity of a donee’s acceptance of a donation in
 
 Rutherford v. Rutherford,
 
 346 So.2d 669 (La.1977), the Louisiana Supreme Court cited Planiol’s Treatise for the following:
 

 Donation is a contract and it naturally presupposes the consent of the donee. He must accept what is offered to him.
 

 Id.
 
 at 672, citing 3 M. Planiol,
 
 Traite élém-entaire de droit civil,
 
 nos. 2562-2563 (11th ed. La. State L. Inst, transl.1959). The court ruled that Civil Code Article 1540 required that a donee accept the donation in
 
 “
 
 ‘precise terms’ [which] obligates a do-nee to use express, formal, and unconditional language in his acceptance. A tacit acceptance or an acceptance inferred from the circumstances will not suffice.”
 
 Id.
 
 at 671.
 

 |1sThe Civil Code addresses in general the required consent for a contract in Article 1927, providing that a contract is formed by the consent of the parties established through offer and acceptance. Consent may be vitiated by error. La. C.C. art. 1948. For a valid contract, the court must find that there was a meeting of the minds of the parties to constitute consent.
 
 Hanger One MLU, Inc. v. Unopened Succession of Rogers,
 
 43,120 (La.App. 2d Cir.4/16/08), 981 So.2d 175. The existence or nonexistence of a contract is a question of fact which will not be disturbed by the appellate court unless clearly wrong.
 
 Id.
 

 In this case, Emmett conceded that the disputed written transaction was never completed as a sale and that no price was ever paid. He therefore had the burden to prove the parties’ mutual intent to give the
 
 *746
 
 written act of sale some other legal effect resulting in a valid transfer of the ownership of the Farm. Emmett’s reconventional demand asserted that the transaction was a disguised donation. Such transaction would be a relative simulation, which by definition would require a showing of the “mutual agreement” between his mother and himself. La. C.C. art. 2025. The fact that both immovable property and an inter vivos donation are involved implicates the important formalities required by our law for the transfer of immovables and the manifestation of donative intent and the donee’s acceptance. La. C.C. arts. 1536 and 1839. Nevertheless, Civil Code Article 1848 allows that a court “may” admit for consideration “in the interest of justice,” testimonial and other evidence to negate the written act of sale and establish it instead as a simulation.
 

 |uThe trial court’s ruling ultimately rested on the testimony of the attorney who notarized the authentic act of sale. We believe that the starting point for consideration of the parties’ “mutual agreement” for the alleged disguised donation must be with the parties themselves. With this perspective, the trial court’s written ruling significantly did not consider Emmett’s testimony concerning his understanding of the transaction.
 

 In his testimony, Emmett was shown the 1996 Sale and questioned by his counsel, as follows:
 

 Q. All right. Now so you have admitted that you didn’t pay your mother for the property?
 

 A. Right.
 

 Q. Is that correct?
 

 A. Yes.
 

 Q. Did she ask for payment?
 

 A. No.
 

 Q. Did you — uh—at the time of that document did you understand that you were not to pay her?
 

 A. No, I did not. I understood I was to pay her. But she refused it. She said there would be no money paid.
 

 Later, on cross examination, Emmett was asked the following:
 

 Q. But why — the curiosity I have, why did she sign a cash sale deed that said you paid her $2,000.00 when she was very familiar with the donation she had donated the house to you, if it was a donation why didn’t she do a donation to you of the 51 acres, the farm? Why try to disguise it?
 

 A. I don’t know.
 

 Emmett made clear in his testimony that his mother never asked or instructed him to receive title to the property for some later division of ownership of the Farm into thirds among himself, Rusty and Alfred. Nevertheless, he also gave the following testimony concerning his understanding of what Mrs. Mathews said in her deposition, and his additional view on the ownership of the property:
 

 IibQ. Okay. In her deposition she stated that she wanted the property divided up three ways, is that correct?
 

 A. Yes.
 

 Q. All right. Now how was that to occur? How — what was your understanding of that?
 

 A. My understanding was that it was to be I guess benefit would be divided up three ways with the property being kept intact between my brother and my cousin, Rusty, Charles and myself.
 

 Q. All right. Okay, so did you attempt to do that?
 

 A. Yes, I did.
 

 Q. How did you attempt to do that?
 

 A. I attempted to bring my brother, Alfred, into the use of the land by either
 
 *747
 
 cutting the timber or farming it or whatever, research to be utilized and we’d spread the profits or pay the cost or whatever. We’d set it up as an agreement between he and I with Rusty being the beneficiary in the event that down the road we deceased and he would get the property in total. Rusty would— Charles R. Gilbert would get the property in total.
 

 Q. Okay. Now was the purpose of that proposal to keep, try to keep it in the Gilbert name?
 

 A. Yes.
 

 Q. That was the desires of your mother?
 

 A. Yes.
 

 This last, somewhat puzzling comment concerning Emmett’s attempt to “spread the profits” with Alfred was not further elaborated upon by either Emmett or Alfred. Nevertheless, in his testimony, Emmett depicts his role as one who “assumed possession” of the Farm “to attempt to more or less keep the farm” as a caretaker for his mother and to foster some ultimate sharing of the ownership between the Mathews and Gilbert families.
 

 This evidence reveals that at the time of the Sale in 1996, Emmett did not understand that his mother was donating the complete and irrevocable ownership of the Farm to him. He did not know his mother’s motive for not selling the property to him and choosing the language in the written act which ultimately proved untrue when she declined payment. He did not know that he was a donee of the Farm since he expected to pay a price.
 

 hfiThis lack of a mutual understanding by the parties at the time of the execution of the Sale is also consequential for determining Emmett’s acceptance of the donation in 1996 or thereafter as a donee before his mother’s death. Though his signature is on the cash sale deed form, the Sale obviously does not express language of his acceptance of the property as a donee. From his testimony, he said he “understood I was to pay her.” The contract of donation, even a disguised donation, is formed by the donee’s acceptance “in precise terms.” La. C.C. art. 1540. Additionally, we find in the record no clear evidence of Emmett’s corporeal possession by his physical acts on the property after 1996 which shows the tacit acceptance of the alleged donation permitted under Civil Code Article 1541.
 
 See,
 
 La. C.C. art. 3425.
 

 Turning to consideration of Mrs. Mathews’s expressions of her intentions for the Sale, there is significant evidence apart from her deposition testimony and before the litigation began. That evidence indicates that she did not intend a complete and irrevocable transfer of the Farm to Emmett which, under the definition of a donation inter vivos, is the essence of a gratuitous conveyance. La. C.C. art. 1468. In 1998, her attorney threatened suit against Emmett over “the invalid deed.” In 1999, she executed an instrument purporting to donate the entirety of the ownership of the Farm to Alfred. These acts clearly imply that the prior Sale was not intended to transfer the ownership of the Farm irrevocably to Emmett, and since all agree that her written act of sale was not in fact a sale, |1vshe demonstrated by these actions that she likewise had no donative intent to transfer the Farm to Emmett.
 

 With those adverse actions on her part already established by the evidence, her deposition testimony following the filing of this suit confirms that no sale was intended between her and her son, and that she had a motive for something other than a donation of complete and irrevocable ownership to Emmett as her donee. In fact, when she was directly asked whether she
 
 *748
 
 donated the Farm to Emmett, she denied a donation. While we can agree with the trial court that Mrs. Mathews in her deposition was discomforted by her health and age and, most importantly, the pressures of the family dispute, we do not view her deposition testimony as incoherent. The deposition was placed into evidence as Joint Exhibit No. 1 without objection. In any event, the deposition testimony only adds to the conclusion that Mrs. Mathews was ambivalent throughout the ordeal, from the 1996 Sale to one son to the 1999 donation to the other, culminating with her testimony at the time of the deposition, in June 2000.
 

 Mrs. Mathews’s ambivalence and Emmett’s intentions for a purchase do not demonstrate to us that at the time of the execution of the written act of sale in 1996, the parties shared a mutual intent and agreement for a donation of the Farm’s ownership to Emmett. Their transaction, which our law requires in writing to transfer the immovable and, more importantly, as an authentic act to insure the proper written expression of the donative intent, should not be recognized as a donation of this immovable under | )Sthese extrinsic circumstances which do not show mutuality of the parties’ intentions.
 

 Finally, from our review of the testimony of Culpepper, we do not find that he knew the parties’ motives for the transaction. He indicated “some” unexplained “problem” had prompted Mrs. Mathews’s action, and he also indicated that he was unacquainted with Emmett at the time that he was asked to prepare the deed. Unlike the attorney in
 
 Nofsinger, supra,
 
 who discussed with all the parties as his clients their mutual reason for the simulated transaction which related to the succession of a family member, Culpepper acted primarily as a notary in this case, preparing and notarizing the simulated deed without a complete understanding of the parties’ intentions. Those intentions, as discussed above, are best revealed by the testimony and actions of the parties.
 

 Accordingly, finding manifest error in the trial court’s ruling, we do not find that Emmett sustained his burden of proving that he and his mother intended a relative simulation or disguised donation by the 1996 Sale. We find that there was no showing of a meeting of the minds of the parties to constitute their mutual consent for a donation. Therefore, the 1996 Sale is an absolute nullity. Furthermore, according to our initial ruling in
 
 Mathews I, supra,
 
 defendant, Charles R. Gilbert, was not a protected third party and is therefore also subject to the determination of absolute nullity of the Sale. The subsequent acts between Emmett and Rusty affecting the property are likewise annulled.
 

 |
 
 iaConclusion
 

 For the above reasons, the judgment of the trial court is reversed. The 1996 Sale and the subsequent acts affecting the property executed between the defendants are annulled. Costs of the appeal are assessed to appellees.
 

 REVERSED.
 

 [1]
 

 . La. C.C. art. 1536 provides:
 

 An act shall be passed before a notary public and two witnesses of every donation inter vivos of immovable property or incorporeal tilings, such as rents, credits, rights or actions, under the penalty of nullity.
 

 [2]
 

 . Because of Louisiana’s forced heirship laws at the time, the simulated sale was often utilized for a donation to avoid an issue of title concerning the heirs of the donor and their rights of collation. There was therefore an obvious legal purpose for disguising the donation in
 
 Nofsinger,
 
 a purpose which cannot serve as an explanation for the present “Sale” because of the amendment to La. C.C. art. 1281 and the limitations on forced heirship after 1995.