GASKINS, J.
|,The plaintiffs, Ken and Barbara Belin, appeal from a trial court judgment denying their request for specific performance of what they purport to be either an agreement to buy and sell or a contract of sale *275 regarding Ruston Farm Implements, Inc. (RFI). RFI is a business owned by the defendants, Curtis and Frances Dugdale. The plaintiffs were awarded damages in the amount of $7,500 for improvements made to the business. For the following reasons, we affirm the trial court judgment.
FACTS
Curtis and Frances Dugdale are the owners of RFI. The business was run by Mrs. Dugdale. Barbara Belin worked at RFI for several years as an office assistant. In February 2005, Mrs. Dugdale began talking about selling the business and the Belins expressed interest in purchasing it. RFI sold Kubota and New Holland tractors and various other brands of tractor equipment. There was some controversy as to whether those companies would allow the Belins to take over the dealership of their products.
Various documents were drafted outlining the agreement between the parties. One draft, which was not introduced at trial, was about one and one-half pages in length. Mrs. Dugdale directed Mrs. Belin to pare down the document and “leave off all that gobbily-poop legal stuff’ so that Mr. Dugdale could understand it. On March 8, 2005, the parties signed a condensed document which had been prepared by Mrs. Belin. The document, referred to by the Belins as “Exhibit A,” stated:
J2RUSTON FARM IMPLEMENTS INC
CURTIS & FRAN DUGDALE/KEN & BARBARA BELIN
THE BELIN’S [sic] AGREE TO PAYA TOTAL OF $1,100,000.00 FOR THE PURCHASE OF RUSTON FARM IMPLEMENTS, INC. (THE BUSINESS AND THE PROPERTY) THIS IS A DRAFT OF THE OPERATING AGREEMENT:
INITIALLY THE BELIN’S WILL;[sic] BUY IN AS A 49% OWNER, TO OBTAIN 49% THE BELIN’S WILL ASSUME $500,000.00 OF THE BANK NOTE AT FIRST NATIONAL BANK. ON THE DATE OF ACQUISITION, THE BELIN’S WILL PUT IN THE BANK THE NECESSARY MONIES FOR DAILY OPERATION.), [sic]
THE BELIN’S WILL ACQUIRE THE REMAINING SHARES OF RFI ($600,000.00) OVER A 5 YEAR PERIOD WITH THE MONEY TO BE PAID TO THE DUGDALE’S [sic] IN ANNUAL INSTALLMENTS AT AN INTEREST RATE OF 7%. NO RENT WILL BE CHARGED ON THE FEED STORE BUILDING UNTI [sic] JAN 2006. THE DUGDALES WILL PAY THE TELEPHONE BILL (FOR 318-251-8234) AND THE ELECTRIC BILL FOR THE FEED BUILDING.
The document was dated March 8, 2005, and all four parties signed it. The document was not notarized.
On April 1, 2005, Mrs. Dugdale announced to the employees of RFI that the Belins were buying the business and that they were going to run it. Beginning on that date, the Belins began operating the business. They made some renovations, cleaned up the premises, and reorganized the inventory. They also hired some new employees and fired one of the existing employees. Mrs. Dugdale maintained an office at the business.
During this time, Mrs. Dugdale contacted a lawyer to draft what was referred to as the “final final” buy and sell agreement. On April 29, 2005, |sMrs. Dugdale informed Mrs. Belin that Mr. Dugdale no longer ■wished to sell the business and that they were not going to go through with the sale. *276 Mrs. Belin took her personal items and left the business.
On June 8, 2005, the Belins filed suit against the Dugdales claiming that the parties executed a written contract to sell RFI to the Belins and that they relied upon the contract by cleaning up the building and grounds, renovating the buildings, rearranging and reconstructing the exteri- or and interior of the buildings, collecting past due accounts, and arranging financing for the purchase of the business. The plaintiffs claimed that on June 1, 2005, the Dugdales, through their attorney, notified the Belins that they would not honor the contract to sell. The Belins sought specific performance of the contract to sell, or in the alternative, damages for detrimental reliance.
Trial on the matter was held on March 9-10, 2009. Frances Dugdale testified that she and her husband had owned RFI since 1989. In February 2005, she began talking to the Belins about buying the business. Mrs. Dugdale stated that several drafts of the agreement between the parties were typed up. At one point, the Belins offered to pay $1.1 million to buy into the business at 49%. According to Mrs. Dugdale, the negotiations changed to the Belins buying 100% of the business for $1.1 million and they were to put down $10,000 in earnest money. According to Mrs. Dugdale, the Belins never paid any money. She said that the fact that the Belins never paid any money was a factor in deciding not to sell the business to them. She | ^testified that if the Belins had come up with the $1.1 million by the end of April 2005, she would have gone through with the sale.
Mrs. Dugdale acknowledged that in April 2005, she informed the employees of RFI that the Belins were in the process of buying the business. The Belins then reorganized the business, made renovations and hired new employees. The Dugdales refused to allow the Belins to mortgage the real estate where the business was located in order to secure their loan with the bank.
During the month of April, when the Belins operated the business, they used only the money in the payroll account. Mrs. Dugdale stated that the banker informed her that the operating account was overdrawn and she transferred $50,000 from the payroll account to the operating account. At the end of April, Mrs. Dug-dale told Mrs. Belin that the Dugdales had decided not to sell the business. According to Ms. Dugdale, the necessary documents to execute the sale had not been signed and the Belins had not paid any money. Mrs. Dugdale testified that the business was later sold to another party for $1.1 million.
Curtis Dugdale testified that his wife was the president and chief operating officer of RFI. Their son, Tommy, was the manager of the business. Mr. Dugdale was not involved in the daily operations of the business. He corroborated his wife’s testimony that the original agreement was for the Belins to buy 49% of the business.
Barbara Belin testified that she worked at RFI for six years as the office manager. She stated that when she and her husband began j ¡-negotiating with the Dug-dales for the purchase of the business, Mrs. Belin drafted a document that was very specific about the terms of the agreement. Adjustments were made in the manner that the Dugdales were to be paid and the percentage of ownership of the business. According to Mrs. Belin, the final agreement was for a full purchase of the business and property for $1.1 million. However, the document reflecting that agreement was stored on the computer that Mrs. Belin used at RFI. This document was never signed by the parties. *277 Mrs. Belin did not produce a copy of this document at trial.
In April 2005, the Belins began operating the business and considered all the money in the payroll account to be theirs. The Belins made improvements to the business. At the end of April, the Dug-dales decided they did not want to sell RFI. Mrs. Belin said that the parties were to go to the lawyer’s office on April 29, 2005 to sign what she termed the “final final” document and the bank would have released the funds to be paid to the Dug-dales.
Mrs. Belin recognized that the document signed by the parties on March 8, 2005, did not contain information on many specifics about the agreement, including how payments where to be made to the Dugdales, how accounts receivable were to be handled, and how tractors and other equipment were to be dealt with. There was also no legal description of the real estate that was to be conveyed with the business, if any. Mrs. Belin acknowledged that the document stated that it was a draft of the operating agreement. She stated that this phrase was left in the document by mistake. _[^However, Mrs. Belin believed that the March 8, 2005 document transferred ownership of the business to the plaintiffs. Mrs. Belin stated that there were issues regarding whether New Holland and Ku-bota would accept the transfer of ownership of the dealership to them, and they put in the agreement that they were purchasing only 49% of the business in order to make the deal more acceptable to New Holland and Kubota. Mrs. Belin believed that they had financing for the deal arranged at the bank.
Kenneth Belin testified and corroborated Mrs. Belin’s testimony. He outlined the negotiations regarding the price to be paid for RFI. Mr. Belin said that they never paid any money to the Dugdales, but when they signed the document on March 8, 2005, he thought that ownership of the business was transferred to the Belins. According to Mr. Belin, his sister and brother-in-law were going to lend them the money through the bank to buy RFI. Mr. Belin stated that he understood that there were difficulties in getting New Holland and Kubota to accept the Belins and release the Dugdales from their wholesale floor plan loan used to finance the tractors and other equipment in inventory. Mr. Belin said that he thought he and Mrs. Belin owned the money in the payroll account. Mr. Belin outlined the renovations and improvements made to the store during April 2005. However, he stated that he did not have an estimate of the costs for renovation of the business.
On August 14, 2009, the trial court issued a written ruling. The trial court stated that, for there to be an action, there must be a contract. For there to be a contract giving rise to a debt, there must be a “meeting of the |7minds” or a “clear understanding” between the parties. Where there is no meeting of the minds or a clear understanding between the parties, there is no enforceable contract. The trial court pointed out that the party which asserts the existence of the contract has the burden of proving the contract.
The court noted that the document dated March 8, 2005, was the only document signed by all the parties. That document was then taken to a lawyer to draft the actual buy/sell agreement with legal descriptions of the property conveyed. The court noted that the document signed by the parties does not deal with how accounts receivable were to be handled or how the purchase price was to be paid. The trial court found that the parties eventually agreed upon a purchase price of $1.1 million, but no money was ever paid to the Dugdales.
*278 According to the trial court, an examination of the document executed on March 8, 2005, leads to the conclusion that the parties contemplated a sale of the common stock of RFI. However, the trial court found:
The testimony of [the Belins] and Mrs. Dugdale reveals something completely different. Hardly ever did the testimony mention what would be considered common stock. The testimony of the parties indicated a complex transaction involving RFI itself. However, exactly what the supposed agreement may have been was not entirely clear.
The trial court noted that it was not clear what assets RFI owned. It was not proved whether the immovable property was an asset to be sold separately or was an asset owned by RFI. There was no authentic act executed by the parties involving immovable property. The court observed that the Belins had not assumed any of the debts of the business and they were aware that there were problems with the tractor manufacturers | ^accepting the transfer of the ownership of the business. The trial court stated that after the document dated March 8, 2005, was signed, negotiations continued and the agreement between the parties changed. The trial court found that this vitiated any prior agreements.
The trial court determined that none of the parties thought the document signed on March 8, 2005, was a final agreement and they were confused as to what was being sold and how the sale was to be accomplished. The trial court found that the plaintiffs failed to show that there was a meeting of the minds, what property was to be transferred, the method of payment, that any price was actually paid, or the amount of damages. Therefore, the trial court found that the document signed on March 8, 2005, was not an enforceable contract.
The trial court held that the Belins did make improvements to the property in the amount of $7,500. A judgment was signed by the trial court awarding damages to the plaintiffs in the amount of $7,500 on this issue, and rejecting all other demands by the plaintiffs. The plaintiffs appealed.
CONTRACT OF SALE/CONTRACT TO SELL
The plaintiffs argue that the document signed by the parties on March 8, 2005, was a contract of sale under La. C.C. art. 2439. In the alternative, the plaintiffs argue that the trial court erred in failing to conclude that the document executed on March 8, 2005, was a contract to sell under La. C.C. art. 2623, giving them the right to demand specific performance. These arguments are without merit.
| flLegal Principles
A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. La. C.C. art. 1906. A contract is formed by the consent of the parties established through offer and acceptance. La. C.C. art. 1927. The four elements of a valid contract are: (1) the parties must possess the capacity to contract; (2) the parties’ mutual consent must be freely given; (3) there must be a certain object for the contract; and (4) the contract must have a lawful purpose. Worley v. Chandler, 44,-047 (La.App.2d Cir.3/4/2009), 7 So.3d 38.
The court must find that there was a meeting of the minds of the parties to constitute consent. Hanger One MLU, Inc. v. Unopened Succession of Rogers, 43,120 (La.App.2d Cir.4/16/08), 981 So.2d 175; Mathews v. Mathews, 43,806 (La. App.2d Cir.12/17/08), 1 So.3d 738. See also Crowe v. Homesplus Manufactured *279 Housing, Inc., 38,382 (La.App.2d Cir.6/21/04), 877 So.2d 156; Creamer Brother’s Inc. v. Hicks, 43,808 (La.App.2d Cir.12/3/08), 998 So.2d 846, writ denied, 2009-0315 (La.4/3/09), 6 So.3d 774. The existence or nonexistence of a contract is a question of fact not to be disturbed unless clearly wrong. Worley v. Chandler, supra.
On appeal, the reviewing court may not set aside a trial court’s findings in the absence of manifest error or unless they are clearly wrong. Where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Even though the appellate court may feel that its own evaluations and inferences are more reasonable than those made by the trial court, reasonable | ^evaluations of credibility and reasonable inferences of fact are not disturbed on appeal where conflicting testimony exists. To reverse a trial court’s factual determinations, the appellate court must find that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. When findings are based on determinations regarding the credibility of a witness, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings. Worley v. Chandler, supra. La. C.C. art. 2439, dealing with contracts of sale, provides:
Sale is a contract whereby a person transfers ownership of a thing to another for a price in money.
The thing, the price, and the consent of the parties are requirements for the perfection of a sale.
The contract of sale is perfected when one party consents to give a certain thing for a price in money and the other consents to give the price in order to have the thing. Benglis Sash & Door Co. v. Leonards, 387 So.2d 1171 (La.1980); Lawrence v. Terral Seed, Inc., 35,019 (La. App.2d Cir.9/26/01), 796 So.2d 115, writ denied, 2001-3134 (La.2/1/02), 808 So.2d 341.
A contract to sell is governed by La. C.C. art. 2623, which provides:
An agreement whereby one party promises to sell and the other promises to buy a thing at a later time, or upon the happening of a condition, or upon performance of some obligation by either party, is a bilateral promise of sale or contract to sell. Such an agreement gives either party the right to demand specific performance.
A contract to sell must set forth the thing and the price, and meet the formal requirements of the sale it contemplates.
| nLa. C.C. art. 2440 states that a sale or promise of sale of an immovable must be made by authentic act or by an act under private signature except as provided by La. C.C. art. 1839.[1]
Discussion
The plaintiffs maintain that ownership is transferred between the parties as soon as there is agreement on the thing and the price is fixed, even though the thing sold is not yet delivered nor the price paid, citing La. C.C. art. 2456.[2] The *280 plaintiffs argue that La. C.C. art. 2485 gives them the right to specific performance and damages.[3] According to the plaintiffs, the parties agreed that the thing to be sold was RFI, including the business and the property, and the price was $1.1 million. Therefore, they claim that they Improved all the elements of a contract of sale and are entitled to specific performance.
In the alternative, the plaintiffs assert that the document signed on March 8, 2005, was a contract to sell, which set forth the thing and the price and met the formal requirements for a sale of immovable property.
The defendants contend that the plaintiffs failed to carry their burden of proof to establish that there was a meeting of the minds or a clear understanding as to the contents of the contract, specifically the item, price, and consent of the parties. The defendants claim that the testimony showed that all parties anticipated further negotiations, more specific details to be addressed, and formal documents to be prepared by a lawyer. However, none of these things took place.
The record in this matter supports the trial court’s conclusion that there was no meeting of the minds in this case and therefore, there was no consent and no enforceable contract of sale or a contract to buy and sell. The document at issue here sets forth a purchase price of $1.1 million for RFI, to be paid by the Belins. The document also states that the sale was for the “business and property” of RFI. However, what is meant by the “business and property” is not specified in the agreement and the record shows that the parties did not have a meeting of the minds on this issue. The document discussed “shares” of the business, but there is conflict in the record as to whether in discussing the “business and property” the parties meant only the shares of the corporation.
11sThere was some testimony about the store building itself. The evidence at trial was unclear what equipment and tractors in the store were to be transferred in the sale. There was also testimony about a transfer of immovable property on which the store building was situated. The Dug-dales owned several acres of land where the store was located. However, from the evidence and testimony, it is not clear how much of the property, if any, was to be conveyed in the sale. No legal description of the immovable property was included in the document sought to be enforced by the plaintiffs.
The document at issue specifies that it is a draft of the operating agreement between the parties, not a contract of sale or a contract to sell. According to Mrs. Be-lin, this phrase was left in the document by mistake. The document specifies that the Belins would assume a $500,000 note owed by the Dugdales and would put their own money in the bank for the daily operation of the business in exchange for 49% of the business. However, the Belins did not assume the note or put their own funds into the bank for the daily operations of the business. The testimony at trial shows that, after the document was signed, the parties continued to negotiate and dis *281 cussed a 100% transfer of ownership of the business and for the payment of a deposit.
Mrs. Dugdale stated that she thought that the March 8, 2005 agreement was “water under the bridge” when the Belins agreed to buy 100% of the business. The testimony of both parties shows that they did not 114perceive the document signed on March 8, 2005, to represent the final agreement between them.
The parties also stated at trial that they both contemplated that Mrs. Dugdale’s attorney, Ray Madden, III, would draft a buy and sell agreement to be executed by the parties which would memorialize the agreement between them. Mr. Madden testified at trial and a copy of the unexe-cuted agreement he drafted was introduced into evidence. That document specified that the corporation was to be purchased for $500,000 and immovable property was to be conveyed for $600,000. A legal description of immovable property was included. There was also a detailed listing of the vehicles and equipment that would remain as a part of the corporation. Provisions were made for the Dugdales to retain control of a portion of the building being used as a feed store. The document also specified that the Belins were to pay a deposit of $10,000 upon the execution of the agreement to buy and sell.
The document stated that the Belins were to assume all debts, liabilities, and obligations of the corporation and would acquire all receivables of the corporation. However, this document was never executed by the parties. Because immovable property was to be conveyed, under the circumstances presented here, the sale or promise of sale was required to be made by authentic act or by act under private signature. La. C.C. art. 2440. Further, the plaintiffs did not show a valid oral transfer of immovable property under La. C.C. art. 1839.
| isThe record supports the trial court finding that when the parties signed the document at issue here on March 8, 2005, there was no meeting of the minds and therefore, no consent to a contract to sell or a contract of sale of RFI. The trial court correctly found that the document was not an enforceable contract of sale or a contract to buy and sell. The plaintiffs are not entitled to specific performance.
DETRIMENTAL RELIANCE
The plaintiffs assert that the trial court erred in failing to use the doctrine of detrimental reliance to find that they relied on the words, actions, and promises of the defendants, entitling the plaintiffs to enforce the contract of sale, contract to sell, and/or recover damages. The plaintiffs outline the efforts undertaken to revitalize the business and maintain that the $7,500 awarded by the trial court was insufficient. The plaintiffs also claim that they are entitled to the $100,000 that was in the payroll account. They claim they owned the entire $100,000 in the account and should have been awarded that amount. This argument is without merit.
La. C.C. art. 1967 provides:
Cause is the reason why a party obligates himself.
A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee’s reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.
The doctrine of detrimental reliance is designed to prevent injustice by barring a party from taking a position *282 contrary to his prior acts, 116admissions, representations, or silence. Suire v. Lafayette City-Parish Consolidated Government, 2004-1459 (La.4/12/05), 907 So.2d 37; Jackson v. Lare, 34,124 (La.App.2d Cir.11/1/00), 779 So.2d 808; Orr v. Bancroft Bag, Inc., 29,046 (La.App.2d Cir.1/22/97), 687 So.2d 1068; Angelo & Son LLC v. Piazza, 2008-370 (La.App. 3d Cir.12/10/08), 1 So.3d 705, writ denied, 2009-0018 (La.2/20/09), 1 So.3d 501.
To recover under the theory of detrimental reliance, a plaintiff must prove the following three elements by a preponderance of the evidence: (1) a representation by conduct or work; (2) justifiable reliance thereon; and (3) a change in position to one’s detriment because of the reliance. Miller v. Miller, 35,934 (La.App.2d Cir.5/8/02), 817 So.2d 1166, writ denied, 2002-1890 (La.10/25/02), 827 So.2d 1154; Northside Furniture of Ruston, Inc. v. First Tower Loan, Inc., 43,736 (La.App.2d Cir.12/3/08), 999 So.2d 151. If the plaintiff suffered no damage in reliance on a promise, there was no detrimental reliance. Jackson v. Lare, supra.
It is difficult to recover under the theory of detrimental reliance because estoppel is not favored in Louisiana law. Claims of detrimental reliance must be examined strictly and carefully. Northside Furniture of Ruston, Inc. v. First Tower Loan, Inc., supra.
Discussion
The testimony at trial which showed that the Dugdales put the Belins in charge of the day-to-day operations of RFI for the month of April while negotiations for the sale of the business continued. The plaintiffs then spent some of their own money to make changes to the store. Mr. Belin testified |17that, in operating the business during the month of April, they cleaned up the premises, mowed, and hauled away trash. The plaintiffs also did renovations to the store which included moving countertops, telephone lines, computer systems, and electrical work. They rebuilt walls and re-inventoried the store, and built new counters and display areas. The plaintiffs also set up a security monitoring system. When questioned about the cost of the renovations, Mr. Belin testified that he did not have an estimate of the costs.
The defendants do not dispute the fact that during the one-month period in which the plaintiffs operated the business, they made renovations to the store. The defendants have not objected to this award on appeal.
The trial court awarded the plaintiffs $7,500 for work done to the store. The plaintiffs failed to prove that they were entitled to more than this amount. The record also shows that, in addition to personal funds expended by the Belins, they also used some of the money in the payroll account for improvements to the store. The money in that account was an asset of RFI.
Based upon this record, the trial court’s award of $7,500 to the plaintiffs for the work done on the store was sufficient. Without evidence as to what the defendants actually spent, we cannot say that the trial court’s award was inadequate. Therefore, we affirm the trial court award.
The plaintiffs also argue that they were entitled to the entire amount of $100,000 that was in the RFI payroll account. The plaintiffs believed that the money in the account belonged to them. However, the record shows that the plaintiffs did not put any of their own money into that account. The |18money in the account was an asset of RFI. There is no showing that this asset was ever transferred to the plaintiffs. The plaintiffs *283 failed to show that they were reasonable in believing that all the money in the payroll account belonged to them. The trial court did not err in refusing to award the $100,000 in the payroll account to the plaintiffs.
CONCLUSION
For the reasons stated above, we affirm that portion of the trial court judgment denying the claims of the plaintiffs, Ken Belin and Barbara Belin, against the defendants, Curtis and Frances Dug-dale. We also affirm that portion of the trial court judgment awarding the plaintiffs damages in the amount of $7,500 for improvements made to Ruston Farm Implements, Inc., a business owned by the defendants. Costs of this appeal are assessed to the plaintiffs.
AFFIRMED.

. La. C.C. art. 1839 specifies that:
A transfer of immovable property must be made by authentic act or by act under private signature. Nevertheless, an oral transfer is valid between the parties when the property has been actually delivered and the transferor recognizes the transfer when interrogated on oath.
An instrument involving immovable property shall have effect against third persons only from the time it is filed for registry in the parish where the property is located.

. La. C.C. art. 2456 provides:
Ownership is transferred between the parties as soon as there is agreement on the *280 thing and the price is fixed, even though the thing sold is not yet delivered nor the price paid.

. La. C.C. art. 2485 states:
When the seller fails to deliver or to make timely delivery of the thing sold, the buyer may demand specific performance of the obligation of the seller to deliver, or may seek dissolution of the sale.
In either case, and also when the seller has made a late delivery, the buyer may seek damages.